[927 NYS2d 67]

In the Matter of METROPOLITAN TRANSPORTATION AUTHORITY. COLLEGIATE CHURCH CORPORATION, Respondent, v METROPOLITAN TRANSPORTATION AUTHORITY, as Condemnor, Appellant.

200 BROADWAY JOINT VENTURE Co., LLC, Respondent, v METROPOLITAN TRANSPORTATION AUTHORITY, as Condemnor, Appellant.

In the Matter of METROPOLITAN TRANSPORTATION AUTHORITY. DLR PROPERTIES, LLC, Respondent, v METROPOLITAN TRANSPORTATION AUTHORITY, as Condemnor, Appellant.

In the Matter of METROPOLITAN TRANSPORTATION AUTHORITY. DLR PROPERTIES, LLC, Respondent, v METROPOLITAN TRANSPORTATION AUTHORITY, as Condemnor, Appellant.

First Department, July 21, 2011

APPEARANCES OF COUNSEL

*Berger & Webb, LLP*, New York City (*Charles S. Webb III, Kenneth J. Applebaum, Judith Z. Katz* and *Adam H. Brodsky* of counsel), for appellant.

*Goldstein, Rikon & Rikon, P.C.*, New York City (*M. Robert Goldstein* of counsel), for Collegiate Church Corporation, respondent.

*Kramer Levin Naftalis & Frankel LLP*, New York City (*James G. Greilsheimer* of counsel), for 200 Broadway Joint Venture Co. LLC, respondent.

*Rosenberg & Estis, P.C.*, New York City (*Michael E. Feinstein* of counsel), for DLR Properties, LLC, respondent.

## OPINION OF THE COURT

RICHTER, J.

On March 29, 2006 (the vesting date), condemnor appellant Metropolitan Transportation Authority (the MTA) acquired five properties in lower Manhattan through eminent domain. The properties, which make up the entire block front on the east side of Broadway between Fulton and John Streets, were acquired in connection with the construction of the Fulton Street Transit Center, a new public transit facility currently under construction. On the vesting date, the properties were

owned by the three claimant respondents: DLR Properties, LLC (Riese), Collegiate Church Corporation (Collegiate), the real estate owning entity of The Minister, Elders and Deacons of the Reformed Protestant Dutch Church of the City of New York, and 200 Broadway Joint Venture Co., LLC (Joint Venture), an entity in which Collegiate had a 49.9% interest and nonparty Brookfield Properties Corporation (Brookfield) had a 50.1% interest.

The northernmost property, 204 Broadway, a two-story retail and office building, was owned by Collegiate. The next property south, 200 Broadway, was a one-story retail building owned by Joint Venture. The property below that, 198 Broadway, a 12-story office building, was owned by Collegiate. The next property south, 194 Broadway, a three-story retail building, was owned by Riese. Finally, the southernmost property, 192 Broadway, was a nine-story office building owned by Collegiate.

After the condemnation, in accordance with the Eminent Domain Procedure Law (EDPL), the MTA made advance payments to Collegiate/Joint Venture and Riese. Claimants filed notices of claim and a joint trial was held to determine whether they were entitled to any additional compensation. Prior to trial, the MTA and Collegiate reached a settlement as to the value of the building at 192 Broadway. However, the settlement left open for trial the issue of whether 192 Broadway's unused development rights, totaling approximately 25,000 square feet, had additional value.

Unused development rights, also known as air rights, represent the difference between the maximum permissible floor area and the actual built floor area on a zoning lot (Department of City Planning, Zoning Handbook, at 146 [2011 ed]). With certain exceptions not applicable here, unused development rights may be sold or transferred as of right from one lot to an adjacent lot through a zoning lot merger, which is the joining of two or more adjacent zoning lots into one new zoning lot (id.).

At trial, the parties introduced appraisal evidence of the value of the properties on the vesting date. The MTA argued that each of the properties should be valued separately. The MTA appraiser valued the Collegiate properties at $37,000,000 (204 Broadway) and $15,500,000 (198 Broadway), and the Joint Venture property (200 Broadway) at $21,950,000, for a total of $74,450,000. He also concluded that the air rights to Collegiate's 192 Broadway could not be transferred because, as of the vesting date, there was no zoning lot merger between the Riese

property (194 Broadway) and the Collegiate/Joint Venture properties. In contrast, Collegiate and Joint Venture maintained that the highest and best use for their properties was a residential condominium building to be constructed on an assemblage consisting of the three northern properties (198, 200 and 204 Broadway) along with the air rights from 192 and 194 Broadway. The Collegiate/Joint Venture appraiser found that Collegiate/Joint Venture's interest in that assemblage had a value of $112,000,000 as of the vesting date.

As for the Riese property (194 Broadway), the MTA appraiser found that the highest and best use was to demolish the building and construct a mixed-use retail and residential building on the site; he set the property's value on the vesting date at $27,440,000. Riese's appraiser, on the other hand, assumed that the building would remain and that the air rights could be sold to a neighboring property. He determined that the total value of the building plus its air rights was $60,630,000.

In a decision dated September 11, 2009, the trial court found that the three northern properties were, for all intents and purposes, under common ownership and control, and there was a reasonable probability that Collegiate and Joint Venture would have assembled these properties. The court further found that it was reasonably probable that Collegiate/Joint Venture would have acquired Riese's property as part of the assemblage, which would then allow through a zoning lot merger for the inclusion of 192 Broadway's air rights. Using the comparable sales approach, and adjusting for various factors, the court determined that the unit price for the assemblage was $311.35 per square foot. Applying this figure to the total square footage of the three northern properties and 192 Broadway's air rights and adjusting for the cost of demolition, the court concluded that Collegiate/Joint Venture's properties had a value of $106,510,521.80. Using the same formula, the court found that Riese's property had a value of $35,224,396.25. Because both of these amounts were higher than the advance payments already made, the court entered judgments directing the MTA to pay claimants the difference along with interest at 9%. The MTA now appeals from those judgments.

It is well settled that the measure of damages in a condemnation case is the fair market value of the condemned property in its highest and best use on the date of taking (*Matter of City of New York [Franklin Record Ctr.]*, 59 NY2d 57, 61 [1983]). This is true even though the owner may not have been utilizing the

property to its fullest potential at the time of condemnation (*Matter of Town of Islip [Mascioli]*, 49 NY2d 354, 360 [1980]). Although an owner is not required to show either that the property had been used at its projected highest and best use, or that there had been an ante litem plan for such use, the owner must establish that there is a reasonable probability that the asserted use "could or would have been made within the reasonably near future" (*Matter of City of New York [Broadway Cary Corp.]*, 34 NY2d 535, 536 [1974]).

"The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value" (*Olson v United States*, 292 US 246, 256 [1934]). Thus, a claimant is entitled to the fair market value of its property for its highest and best available use even though that use is in connection with adjoining properties, provided there is a reasonable probability that the condemned property would be combined with other tracts in the reasonably near future (*United States ex rel. TVA v Powelson*, 319 US 266, 275-276 [1943]; *see also Commissioner of Transp. v Towpath Assoc.*, 255 Conn 529, 540, 767 A2d 1169, 1177 [2001]; 4-13 Nichols on Eminent Domain § 13.01 [20] [2010]). Contrary to the MTA's contention, courts in New York have recognized that the reasonable probability standard applies to potential assemblages (*see e.g. Yaphank Dev. Co. v County of Suffolk*, 203 AD2d 280, 281-282 [1994]; *New York State Urban Dev. Corp. v Wanger*, 58 AD2d 955, 956 [1977]; *Matter of City of Rochester v Iman*, 51 AD2d 651, 652 [1976]).

Whether there was a reasonable probability of an assemblage is a question of fact (*see Rodman v State of New York*, 109 AD2d 737, 737 [1985]; *see also Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York*, 8 NY3d 591, 595-596 [2007] [valuation of property presents a question of fact]). On appellate review of a nonjury trial,

> "the findings of fact should be viewed in a light most favorable to sustain the judgment, due deference should be accorded Trial Term in matters of credibility, and the findings of fact should not be disturbed unless such determination could not have been reached under any fair interpretation of the evidence" (*Richstone v Q-Med, Inc.*, 186 AD2d 354, 354 [1992]; *see Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992]; *Horsford v Bacott*, 32 AD3d 310, 312 [2006]).

These standards are applicable to condemnation cases (*see e.g. Matter of Board of Commr. of Great Neck Park Dist. of Town of N. Hempstead v Kings Point Hgts., LLC*, 74 AD3d 804, 806 [2010], *appeal dismissed and lv denied* 16 NY3d 848 [2011]; *Matter of City of Syracuse Indus. Dev. Agency [Alterm, Inc.]*, 20 AD3d 168, 170 [2005]; *Matter of New York City Tr. Auth. [Estate of Donner] v City of New York*, 166 AD2d 336 [1990], *lv denied* 79 NY2d 756 [1992]).

Here, there was sufficient evidence to support the trial court's findings. The evidence showed that Collegiate's interest in pursuing an assemblage of the entire Broadway block front started long before any condemnation was contemplated. In 1997, Collegiate hired Casey Kemper to manage its real estate portfolio. At that time, Collegiate owned three of the five properties on the block (204, 198 and 192 Broadway). In 1998, Collegiate retained a broker, Cushman & Wakefield, to explore the possibility of assembling the block front by acquiring the other two properties (200 and 194 Broadway). Cushman & Wakefield prepared projections of outlays and returns and explored financing alternatives in connection with the proposed acquisition. Collegiate's counsel, Carter Ledyard & Milburn, also was brought on board to assist in the planning, and a real estate consultant was hired. According to Kemper, pursuit of the Broadway assemblage was a top priority for Collegiate.

By the beginning of 2001, Collegiate had embarked upon partnership discussions with Brookfield, a major North American developer. Brookfield had commissioned a brokerage firm, Massey Knakal Realty Services, to prepare a strategy for acquiring and developing the entire square block, including the Broadway properties. The report laid out a road map for acquiring the properties in stages and was based on the premise that Brookfield and Collegiate would enter a joint venture and that Collegiate's properties would be part of the assemblage. The report indicated that the three Collegiate properties were the "key element" of the plan and the remaining two properties on the block front (200 and 194 Broadway) were the "most valuable pieces" of the project. Lawrence Graham, Brookfield's executive vice-president, shared and discussed this report with Kemper.

From March through May 2001, Brookfield and Collegiate exchanged draft letters of intent outlining the terms of a proposed joint venture to develop the block. Although it was nonbinding, both parties indicated that this was a common

practice, subject to final negotiation of joint venture documents. Numerous meetings were held between Brookfield and Collegiate to discuss the terms of the letter. Although no formal agreement was signed, both Kemper and Graham, who had a long-standing professional relationship, testified that the parties were in basic agreement. The structure of the deal was that Collegiate would contribute its properties to the project and Brookfield would provide capital and development expertise. With a general agreement reached in principle, Brookfield retained an architect, Skidmore, Owings & Merrill LLP, to prepare drawings for the potential development.

Meanwhile, Riese too was interested in being part of the development of the Broadway block front. Dennis Riese, Riese's chief executive officer, testified that his interest went as far back as 1985, when he entered into "serious discussions" with Collegiate's then executive director of real estate; the two men discussed their mutual interest in developing the block. Since Riese was not in the business of developing properties, Mr. Riese met with five different developers. Mr. Riese explained that nothing concrete came of these early discussions because his father and uncle, who controlled Riese at the time, had a different vision for the property. Development plans were further halted when Riese encountered severe financial difficulties in the late 1980s and the company went into bankruptcy.

After Riese emerged from bankruptcy in August 2000, Mr. Riese again turned his attention to the development of the block front. In 2001—again, before the MTA announced any condemnation plan—Kemper began discussions with Mr. Riese about acquiring 194 Broadway as part of the assemblage. Kemper informed Mr. Riese that Collegiate was interested in the Riese property, or its air rights, as part of the development. Mr. Riese told Kemper that he was willing to sell Collegiate either the air rights or the fee itself. Collegiate also retained a consultant, Robert Von Ancken, to appraise the property and meet with Mr. Riese to negotiate a deal.

Plans for the assemblage were temporarily halted by the events of September 11, 2001, as claimants focused on repairing and cleaning their properties located near the former World Trade Center. In 2002, Brookfield decided to scale down its plans to develop the entire square block and instead began to explore developing just the Broadway block front. Von Ancken prepared an appraisal of the Riese property dated August 2, 2002 for the purpose of negotiating a price with Mr. Riese. Fur-

ther architectural drawings and massing studies were prepared on the possible assemblage of the Broadway block front properties.

In September 2002, Collegiate and Brookfield learned of possible condemnation plans for the site; Riese found out about the potential plan several months later. Nevertheless, claimants continued their pursuit of an assemblage. In fact, Collegiate approached the MTA about joining forces to jointly develop the area and proposed a commercial or residential development to be built above the transit center. Minutes from a February 2003 board meeting confirm that Collegiate was still interested in the assemblage and that it viewed the condemnation only as a "possible scenario." In May 2003, Collegiate sent Brookfield an outline of the key terms of a transaction to develop the five buildings comprising the Broadway block front. There was basic agreement between the parties as to these terms.

In October 2003, Brookfield purchased the 200 Broadway property in connection with the proposed assemblage with the Collegiate properties. In March 2004, Joint Venture was formed between Collegiate and Brookfield and title to 200 Broadway was transferred to the new entity. Collegiate's interest in Joint Venture was 49.9% and Brookfield's was 50.1%. Despite the fact that Collegiate had a slightly smaller ownership interest, the Joint Venture Agreement provided that Collegiate would manage the property and that Collegiate's consent was required for any action taken on major matters. Furthermore, the evidence established that the reason Joint Venture was not set up as an exact 50/50 partnership was so that Brookfield could avoid paying transfer taxes. Thus, the record supports the trial court's finding that the three northern properties were, for all intents and purposes, under common ownership and control (see e.g. *Johnson v State of New York*, 10 AD3d 596, 598 [2004] [joint control over subject parcels was enough to establish unity of ownership for valuation purposes]).

The acquisition of 200 Broadway meant that Collegiate and Joint Venture now together controlled four of the five properties on the block front. The parties then focused their attention on 194 Broadway, the remaining property owned by Riese. In 2004, at Brookfield's request, Costas Kondylis and Partners LLP, an architectural firm, prepared a series of drawings of various residential projects to be built on the three northern lots. One of the drawings contemplated a zoning lot merger of the five properties on the block front, including Riese's prop-

erty, which would also allow for inclusion of the air rights from 192 Broadway, the southernmost property.

In a November 12, 2004 letter, Collegiate offered to buy Riese's air rights. Although the letter stated that the Collegiate's offering price was undecided, it suggested $60 per square foot. Collegiate explained that this price was deliberately low and was intended to jump-start negotiations. Mr. Riese testified that he was "encouraged" by Collegiate's letter and that he had an "ardent desire" to complete a deal, but that he was not satisfied with the initial offer. The parties met a few weeks later to continue negotiations. In a letter to Collegiate dated December 9, 2004, Mr. Riese wrote that "we both now agree that . . . a joint development is currently possible and should be done." The letter also suggested that the parties continue their discussions. Shortly thereafter, a public hearing on the condemnation was held. On March 31, 2005, determinations and findings were issued, and title to the property vested in the MTA on March 29, 2006.

We conclude that a fair interpretation of the evidence supports the trial court's findings on the assemblage. The MTA's claim that Collegiate and Brookfield never had an interest in pursuing a joint development project but were merely building up their condemnation claims is belied by the history between the parties, which began long before any hint of condemnation. Starting as early as 1998 and continuing up until the condemnation, Collegiate took concrete steps in furtherance of the assemblage including hiring architects, law firms and consultants, partnering with a major developer, acquiring 200 Broadway and negotiating to take control of the Riese property.

Likewise, the trial court had a basis in the record for rejecting the MTA's claim that Riese had no true intention of selling its property. Mr. Riese testified that his interest in a potential development started in 1985 when he initiated discussions with Collegiate. Those early talks were put on hold due to the fact that Mr. Riese's father and uncle, who controlled Riese at the time, were not interested in developing the property. Riese subsequently entered into bankruptcy, which further delayed the development plans. But after Riese came out of bankruptcy and Mr. Riese's father and uncle were no longer in control of the company, Mr. Riese again began to take steps to sell the property to Collegiate.

Mr. Riese testified that he wanted to complete a deal and that he believed the parties were "closer than ever." Collegiate's

negotiator, Robert Von Ancken, also believed a deal would be reached between Riese and Collegiate because it made "economic sense to both parties." Brookfield's executive vice-president, Lawrence Graham, testified that he too believed that the parties would reach an agreement. Indeed, even the MTA appraiser testified that it was in the economic interest of Collegiate to reach an agreement with Riese. The trial court's conclusion that a deal was reasonably probable necessarily reflected a finding that these witnesses were credible. Such credibility determinations are entitled to deference (*Campbell v Campbell*, 72 AD3d 556, 556-557 [2010]).

█ It is of no legal consequence that claimants took some steps in furtherance of the assemblage after the condemnation was announced (*see e.g. Matter of City of New York*, 94 AD2d 724 [1983], *affd* 61 NY2d 843 [1984]). There is no question that Brookfield and Collegiate had plans to acquire 200 Broadway long before they had any knowledge of a possible condemnation. As the trial court found, it would make little sense that Brookfield, a major developer, would have any interest in purchasing 200 Broadway, a simple one-story retail building, without plans for some sort of major assemblage.

When asked why the property was purchased even though a condemnation was announced, Kemper explained that MTA's announcement did not foreclose the possibility that an assemblage would still occur. The MTA's own appraiser acknowledged that development plans can still proceed after a condemnation is proposed because no one can predict when in the future an actual taking might occur. Indeed, here, the actual taking took place more than three years after the condemnation was announced. Despite the fact that, at the time of the purchase, Collegiate and Brookfield knew of the potential condemnation, "such knowledge, without more, was insufficient to establish that [their actions were taken] in bad faith" (*Matter of Town of E. Hampton [Windmill II Affordable Hous. Project (9 Parcels)]*, 44 AD3d 963, 964 [2007]; *see also Vitale v State of New York*, 33 AD2d 977 [1970], *lv dismissed* 26 NY2d 611 [1970]).

█ "In determining an award to an owner of condemned property, the findings must either be within the range of the expert testimony or be supported by other evidence and adequately explained by the court" (*Matter of City of New York [Reiss]*, 55 NY2d 885, 886 [1982]). The court here sufficiently explained its method of valuing claimants' properties, which

was, in large part, based on the Collegiate/Joint Venture appraisal. The evidence at trial supports the court's inclusion of the Riese building in the assemblage. Mr. Riese testified that he was willing to sell the entire property and the 2002 appraisal prepared by Collegiate's consultant was for the whole property, not just the air rights. Furthermore, Collegiate/Joint Venture's appraiser testified that he met with Mr. Riese for the purpose of buying both the land and air rights.

Although the MTA argues that the trial court should have applied a discount based on the possibility that the properties might not be assembled, there is no evidence in the record as to what, if any, that discount factor should have been. The MTA appraiser, in his rebuttal report to the Collegiate/Joint Venture appraisal, proposed an alternative value for the assemblage but did not apply any such discount. Nor, in his rebuttal report to the Riese appraisal, did he argue that a discount should be applied to the potential sale of air rights.

■ The land unit value (price per square foot) found by the court was within the range of expert testimony and adequately supported by the record. The court's choice of comparable sales, which is entitled to deference, was proper (*see 627 Smith St. Corp. v Bureau of Waste Disposal of Dept. of Sanitation of City of N.Y.*, 289 AD2d 472, 473-474 [2001], *lv denied* 98 NY2d 611 [2002], *appeal dismissed* 98 NY2d 646 [2002]; *Matter of Caldor, Inc. v Board of Assessors*, 227 AD2d 400 [1996]). The court did not err in averaging the adjusted comparable sales (*see Matter of Town of Islip v Sikora*, 220 AD2d 434, 436 [1995]). *Latham Holding Co. v State of New York* (16 NY2d 41 [1965]) is distinguishable because that case involved *unadjusted* comparables. We note that the MTA appraiser also averaged adjusted comparable sales. The trial court's decision to use $20 per square foot as the cost of demolition is supported by the testimony of the MTA appraiser, who stated that he had used this figure on other projects. Furthermore, as the court observed, the record was devoid of any certified appraisals from demolition contractors.

■ The court properly applied a 9% rate for postjudgment interest pursuant to McKinney's Unconsolidated Laws of NY § 2501 (L 1939, ch 585, as amended by L 1982, ch 681, § 4 ["The rate of interest to be paid by a public corporation upon any judgment or accrued claim against the public corporation shall not exceed nine per centum per annum"]). Public Authorities Law § 1276 (5) is not applicable to condemnation claims (*Matter*

*of Metropolitan Transp. Auth. v American Pen Corp.*, 94 NY2d 154, 159 [1999]).

The MTA also appeals from a December 17, 2009 order which granted Riese's motion for an additional allowance pursuant to EDPL 701. On December 1, 2005, prior to the vesting date, the MTA offered Riese $15,800,000 for 194 Broadway. Riese rejected the offer as payment in full but accepted it as an advance payment. Several months later, on March 14, 2006, the MTA increased its offer to $24,400,000. Riese again rejected the offer as payment in full but accepted it as an advance payment. In or about December 2007, after the vesting date, the MTA offered Riese an additional $2,200,000, bringing the total advance payments to $26,600,000. Again, Riese rejected the offer as payment in full but accepted it as an additional advance payment.

After trial, Riese moved pursuant to EDPL 701 for an additional allowance for attorneys' fees, disbursements and appraisal fees. The MTA argued that Riese was not entitled to any additional compensation. The court concluded that some award was warranted but was not persuaded that the amounts sought were appropriate. The court referred to a special referee "the appropriate amount of . . . fees and expenses . . . incurred by the necessity of bringing this matter to trial."

█ EDPL 701 provides that a court "may in its discretion" award the condemnee an additional allowance for fees and expenses where the condemnation award is "substantially in excess of the amount of the condemnor's proof and where deemed necessary . . . for the condemnee to achieve just and adequate compensation." "The statute assures that a condemnee receives a fair recovery by providing an opportunity for condemnees whose property has been substantially undervalued to recover the costs of litigation establishing the inadequacy of the condemnor's offer" (*Hakes v State of New York*, 81 NY2d 392, 397 [1993]).

Contrary to the MTA's claim, the court's $35,224,396.25 valuation of Riese's property was "substantially in excess" of both the initial $15,800,000 offer (a 122.9% difference) as well as the supplemental offer of $24,400,000 (a 44.4% difference) (EDPL 701; *see Matter of Metropolitan Transp. Auth. v Ausnit*, 306 AD2d 190 [2003] [award that is 35.3% more than the offer is substantially in excess of it]; *Matter of Gelsomino v City of New*

*Rochelle*, 25 AD3d 554, 555 [2006] [additional allowance granted where award was 35.5% above the offer]).*

We find no abuse of discretion in the court's ordering a hearing to determine the amount necessary for Riese to achieve just and adequate compensation. The MTA's argument that a fee award is not warranted because Riese expended fees in support of a valuation method that the court purportedly rejected and because the valuation that Riese advocated for its property was much higher than the court's valuation is premature. The parties can address at the hearing how much of the fees were necessary.

■ Riese's failure to include affidavits from its attorney and appraiser in its opening papers is not fatal to its application. The statute requires that "[t]he application . . . include affidavits of the condemnee and all parties that have incurred expenses on the condemnee's behalf, setting forth inter alia the amount of the expenses incurred" (EDPL 701). Riese's initial motion papers satisfied this requirement. In this context, appraisers and attorneys do not incur expenses. Rather, they bill the condemnee, which is the party that incurs the expenses. In any event, in its reply papers, Riese included an affidavit and affirmation from its appraiser and attorney, respectively, and the MTA will have an opportunity to challenge those documents at the hearing.

There is no merit to the MTA's claim that the trial court mistakenly believed that it lacked the discretion to deny an additional allowance. A fair reading of the decision shows that the court understood its obligation and applied the correct standard. Even if the MTA is correct, we would, in the exercise of our own discretion, reach the same result.

■ Because EDPL 501 (B) requires that Supreme Court "hear . . . all claims arising from the acquisition of real property . . . without referral to a referee," the hearing should be conducted by the court, not a referee.

Accordingly, the judgment of the Supreme Court, New York County (Walter B. Tolub, J.), entered December 1, 2009, against condemnor MTA and in favor of claimant DLR Properties, LLC, in the total sum of $11,480,370.98, including interest at the rate of 9% per year, should be affirmed, without costs. The judgment of the same court and Justice, entered December 3, 2009,

---

* The MTA does not contend that the award should be compared to the $26,600,000 postvesting offer made in December 2007.

against condemnor MTA and in favor of claimants The Minister, Elders and Deacons of the Reformed Protestant Dutch Church of the City of New York and Joint Venture, in the total sum of $44,158,004.44, including interest at the rate of 9% per year, should be affirmed, without costs. The order of the same court and Justice, entered December 17, 2009, which granted Riese's motion for an additional allowance pursuant to EDPL 701 and referred to a special referee the appropriate amount of the additional allowance should be modified, on the law, to direct that Supreme Court conduct the hearing, and otherwise affirmed, without costs.

TOM, J.P., SWEENY, FREEDMAN and ABDUS-SALAAM, JJ., concur.

Judgment, Supreme Court, New York County, entered December 1, 2009, affirmed, without costs. Judgment, same court, entered December 3, 2009, affirmed, without costs. Order, same court, entered December 17, 2009, modified, on the law, to direct that Supreme Court conduct the hearing, and otherwise affirmed, without costs.