OPINION OF THE COURT
Moskowitz, J.
This appeal arises from a business transaction between Konstantin Kagalovsky and Vladimir Gusinski, both of whom are successful businesspeople. Before becoming involved in the media venture at issue in this case—Iota Ventures LLP (the partnership) a partnership formed for the purpose of owning, developing and operating a Ukranian television network called TVi—Gusinski developed and operated Russian-language media businesses, founding what eventually became one of the top three private television networks in Russia. For his part, Kagalovsky, who has a Ph.D. in economics, served as Russia’s representative on the Board of the International Monetary Fund, and also served, among other positions, as Deputy Chairman for a leading privately owned Russian oil company.
In early 2007, Gusinski decided to create a television channel in Ukraine, as he believed that the country had a promising television market. He shared his intention with Kagalovsky, *72 whom he knew socially, and Kagalovsky expressed a desire to join Gusinski in the new venture. Over the next several months, the two men discussed the project.
In late 2007, continuing in 2008, Gusinski and Kagalovsky had a series of meetings in Gusinski’s offices in Manhattan and London. Kagalovsky toured Gusinski’s television studios in Manhattan and met in New York with personnel from Gusinski’s television companies to learn about the business. Further, Kagalovsky came to New York to negotiate the terms of licensing agreements for programming to be aired on TVi. In fact, in December 2007, Kagalovsky signed an agreement for a security pass for Gusinski’s Manhattan offices; the pass would have allowed Kagalovsky unfettered access to those offices, from which TVi was broadcast in the first months of its operation.
During the series of 2007 and 2008 meetings, Gusinski and Kagalovsky negotiated the formation of the partnership. On April 14, 2008, Gusinski and Kagalovsky executed a partnership agreement, and, according to the terms of that agreement, were to own and control TVi equally. Kagalovsky, however, took primary responsibility for the financial oversight and the establishment of the structure for the television network—an endeavor that included organizing the legal and financial structure of the partnership.
Acting on instructions from Kagalovsky, Grant Brown, who managed Kagalovsky’s trusts and business entities, and Alexis Maitland Hudson, Kagalovsky’s attorney, worked to establish an ownership structure for TVi. Because Ukranian law required TVi to be owned by a Ukranian company, the partnership ultimately held TVi through subsidiaries organized in Cyprus and Ukraine. A series of these subsidiaries owned TeleRadioSvit LLC (TRS), a Ukranian entity; TRS, in turn, operated as TVi.
On April 14, 2008, the same day as the signing of the partnership agreement, plaintiff New Media Holding Company, L.L.C. (New Media), Gusinski’s nominee, acquired a 50% interest in the partnership; Kagalovsky’s nominee, Iota LR owned the other 50% interest.[1] Thus, through their nominees’ equal ownership interests, Gusinski and Kagalovsky owned and controlled 100% of TVi. Over 2008 and much of 2009, the parties contributed *73 around $24 million—roughly $12 million each—to develop and operate TVi.
The partnership agreement was to be governed by the law of New York State, but also expressly incorporated rights and obligations provided under the Delaware Revised Uniform Partnership Act (DRUPA) (Del Code Ann, tit 6, § 15-101 et seq.). For example, the partnership agreement provided that “[e]xcept as otherwise provided herein, all rights, liabilities and obligations of the Partners, both as between themselves and as to persons not parties to this Agreement, shall be as provided in [DRUPA].”
The partnership agreement designated Brown as manager of the partnership’s day-to-day operations, but the partners retained joint management and decision making authority. To that end, the partnership agreement incorporated the joint management and consent provisions of DRUPA, which stated in relevant part that (i) “[e]ach partner has equal rights in the management and conduct of the partnership business and affairs”; (ii) “[a] difference arising as to a matter in the ordinary course of business of a partnership may be decided by a majority of the partners”; and (iii) “[a]n act outside the ordinary course of business of a partnership may be undertaken only with the consent of all of the partners” (Del Code Ann, tit 6, § 15-401 [f], [j]). Although Brown had not spoken with Gusinski before the parties executed the partnership agreement, he understood that he “had a duty to be honest” to both partners of the partnership.
In summer 2009, Gusinski and Kagalovsky began to have disputes over TVi, and on September 6, 2009, the two met at Kagalovsky’s house in London to discuss their differences. During that meeting, Gusinski offered to buy Kagalovsky’s 50% interest, but Kagalovsky refused the offer.[2]
After the partners failed to resolve their disputes, Kagalovsky decided to force Gusinski’s ouster by secretly diluting Gusinski’s ownership interest.[3] Through a series of allegedly clandestine transactions, Kagalovsky eventually transferred more than *74 99% of TVi’s equity to companies that his family trusts owned; as a result of these transactions, nonappealing defendants Aspida Ventures, Ltd. and Seragill Holdings, Ltd. now own 99% of TVi. Kagalovsky, who paid only $68,000 for the transfers, is the ultimate beneficiary of both Aspida and Seragill and he completely dominates and controls both companies.
Gusinski did not know about the transactions at the time Kagalovsky made them. Moreover, after Kagalovsky and his representatives had diluted the partnership’s (and therefore Gusinski’s) interest in TVi, Gusinski contributed another $850,000 to the partnership.
In addition to diluting the partnership’s ownership of TVi, Kagalovsky stopped payment on fees for programming that TVi was licensing from New Media Distribution Company (NMDC), an entity of which Gusinski held an 85% share.[4] Indeed, past due licensing fees to NMDC accounted for almost half of the $850,000 that Gusinski transferred to the partnership after his interest had been diluted, but Brown never paid the fees due.
In late September 2009, Kagalovsky consolidated control of TVi through his representatives and ousted Gusinski’s representative at the network. The dilution was complete by around the beginning of October 2009. Brown received records concerning the dilution, but did not inform either New Media or Gusinski. Further, on October 14, 2009, Brown executed an assignment deed; that deed transferred certain TVi trademark rights from the partnership to TRS, which by that time was 99% owned by Kagalovsky’s trusts. As with the dilution, no one informed New Media or Gusinski about the transfer of trademark rights.
Throughout October and November 2009, defendants continued to act as though the partnership still owned TVi. For example, on October 16, 2009, Kagalovsky’s attorney, Maitland Hudson, wrote a letter to Gusinski’s counsel in New York, stating (falsely, by that time) that the partnership had “a single potential asset. . . namely its indirect shareholding” in TVi. In his letter, Maitland Hudson also described the partners as “equal participant^]” in the “TVi business.” Similarly, even after the dilution and transfer of trademark rights, Brown continued to request funding from New Media, making a request for $2.1 million in operating expenses through January 2010.
*75 On November 24, 2009, Gusinski’s representatives learned of the dilution and the transfer, and Gusinski confronted Brown to determine what had happened. Although Brown was aware of the relevant events, and in fact had been apprised of the dilution at the time it was occurring and immediately afterward, he denied that he knew about any transfer of TVi shares. To further his deception, Brown created an email chain feigning ignorance of the transfers and purporting to make further inquiries about them.
In October 2009, NMDC sued the partnership in the United States District Court for the Southern District of New York, demanding that the partnership pay the outstanding licensing fees. Around one month later, in November 2009, Iota LP sued New Media and Gusinski, also in the Southern District of New York, alleging breach of fiduciary duties in connection with the partnership.
On November 30, 2009, Kagalovsky and Iota LP’s then-counsel wrote to New Media’s counsel, noting that New Media’s Jersey (Channel Islands) counsel had contacted Brown and threatened to sue him in a Jersey court. Kagalovsky and Iota’s counsel took the position that any litigation involving New Media “should be commenced in New York” rather than in the courts of Jersey, Channel Islands, where both Iota and the partnership had their principal places of business. Counsel further noted that NMDC had tried to start litigation in Kiev even though it had already commenced litigation in New York. Counsel stated his belief that the various litigations involving NMDC, the partnership, and Brown “may require the intervention of New York’s courts” and inquired “whether your clients wish to resolve the various issues raised to date in the courts of New York, where you filed first, or all over Europe as well.”
On December 14, 2009, New Media sued Kagalovsky, Iota LP, Aspida and Seragill in New York state court, asserting, among other things, claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract and tortious interference with contract (New Media Holding Co. L.L.C. v Kagalovsky, Sup Ct, NY County, index No. 603742/2009 [action No. 1]). A few days later, after voluntarily dismissing its federal action, NMDC refiled its federal claims in state court, this time including Kagalovsky and Iota LP as defendants with the partnership, and adding an unjust enrichment claim as against Kagalovsky (New Media Distribution Co. L.L.C. v Iota Ventures LLP, Sup Ct, NY County, index No. 650754/2009 [ac *76 tion No. 2]). Kagalovsky and Iota LP filed counterclaims in action No. 1, adding NMDC and Gusinski as counterclaim defendants, and filed nearly identical counterclaims against NMDC in action No. 2.
Kagalovsky and Iota successfully moved to consolidate the actions for discovery, and then twice moved to consolidate the actions for trial. The trial ultimately took place over 24 days between December 7, 2011 and April 26, 2012.
Kagalovsky and Iota LP, both nondomiciliaries of New York State, argue that the record shows no basis for long-arm jurisdiction under CPLR 302. Thus, they conclude, the trial court erred when it precluded them from presenting evidence on the question of jurisdiction.
To begin, this court has already found, on a prior appeal, that the trial court properly exercised jurisdiction over nonparty defendants Aspida Ventures, Ltd. and Seragill Holdings, Ltd. (97 AD3d 463 [1st Dept 2012]). Our determination was based upon a finding that those two entities were Kagalovsky’s agents. As we noted, Kagalovsky’s
“negotiation of the partnership agreement in New York and . . . Iota LP’s subsequent actions in New York, including its commencement of an action in federal court in New York based on the partnership agreement, are sufficient to show that [Aspida and Seragill], ‘through an agent,’ transacted ‘any business within’ the state” under CPLR 302 (a) (1) (97 AD3d at 464).
This framework has not changed since this case was last before us on appeal. Kagalovsky and Iota LP admit, as they must, that Kagalovsky visited New York several times, and met during those visits with Gusinski or Gusinski’s representatives. However, Kagalovsky and Iota LP adamantly denied at trial (and continue to deny on appeal) that any of the New York meetings involved TVi or discussions about the partnership agreement. Rather, they insist, Kagalovsky and Gusinski had already agreed to all the essential terms of the partnership by the time Kagalovsky visited New York on December 18, 2007. The trial court understandably found these protestations to be incredible and determined that, in fact, it had jurisdiction over defendants. We find no basis in the record to disturb the trial court’s credibility determinations (Matter of Metropolitan Transp. Auth., 86 AD3d 314, 320 [1st Dept 2011]). At any rate, despite defendants’ arguments to the contrary, the testimony in *77 the record supports that conclusion; although Gusinski did not recall the details of the first meeting that he had with Kagalovsky, he did recall that later negotiations regarding the partnership took place in New York. Similarly, Gusinski’s counsel testified that negotiations over forming the partnership took place in New York City and London beginning in late 2007 into 2008.
Nor does maintenance of this action in New York “offend traditional notions of fair play and substantial justice,” as Kagalovsky and Iota LP maintain; in fact, this theory contradicts their previous position in this litigation. As noted above, Kagalovsky and Iota LP’s then-counsel took issue with commencing litigation in Jersey, stating that litigation should be commenced in New York courts rather than courts in Jersey or Kiev. Having stated through their counsel that they not only submitted to jurisdiction here, but insisted on it, Kagalovsky and Iota LP cannot now be heard to complain that jurisdiction by a New York court offends notions of substantial justice.
Similarly, Kagalovsky and Iota LP waived the right to challenge personal jurisdiction by freely using the protections of the New York courts when pursuing rights related to the partnership. For example, as noted above, Iota LP filed the first lawsuit against New Media in the Southern District of New York (see Bernstein v 1995 Assoc., 211 AD2d 560 [1st Dept 1995]; Biener v Hystron Fibers, 78 AD2d 162, 166 [1st Dept 1980]).
Further, the waiver resulting from that voluntary submission to New York’s jurisdiction is attributable to Kagalovsky as Iota LP’s alter ego. Contrary to defendants’ contention, this Court’s determination on the prior appeal that defendants Aspida Ventures and Seragill Holdings and defendants Kagalovsky and Iota LP were alter egos (97 AD3d at 464) is the law of the case, foreclosing reexamination of this issue and precluding the need for additional evidence (see Board of Mgrs. of the 25 Charles St. Condominium v Seligson, 106 AD3d 130, 135 [1st Dept 2013]).
We turn now to the breach of contract and breach of fiduciary duty claims.[5] The existence of the partnership agreement supports the trial court’s finding of both breach of contract and breach of fiduciary duty (see Garber v Stevens, 94 AD3d 426 [1st *78 Dept 2012]; Andersen v Weinroth, 48 AD3d 121, 136 [1st Dept 2007]). Indeed, the partnership agreement expressly rendered the parties subject to the fiduciary obligations set forth in DRUPA (see Schuss v Penfield Partners, L.P, 2008 WL 2433842, *10, 2008 Del Ch LEXIS 73, *34 [June 13, 2008, No. 3132-VCP]; RJ Assoc. Inc. v Health Payors’ Org. Ltd. Partnership, HPA, Inc., 1999 WL 550350, *10, 1999 Del Ch LEXIS 161, *36 [July 16, 1999, No. 16873]; Mandelblatt v Devon Stores, 132 AD2d 162, 167-168 [1st Dept 1987]).
Here, the trial court found that the acts of defendants Kagalovsky and Iota LP “frustrated the entire purpose of the Partnership Agreement, and injured and destroyed New Media’s right to receive the fruits of the Partnership Agreement, all in breach of the implied covenant of good faith and fair dealing,” and it cannot be said that the trial court’s “determination could not have been reached under any fair interpretation of the evidence” (Matter of Metropolitan Transp. Auth., 86 AD3d 314, 320 [1st Dept 2011]).
As for the amount of damages, we reject defendants’ contention that the trial court erred in calculating the awarded amount. First of all, it was defendants, not New Media, that sought, mid-trial, to include expert evidence and to change the way the court examined damages. Indeed, the court granted defendants’ motion to advance a change in theory because defendants wanted to introduce expert testimony; plaintiffs actually objected to the change. New Media then moved its own valuation expert’s testimony and report into evidence with no objection from defendants. Defendants accepted this report even though it set forth the theory of damages to which they now object. Quite to the contrary, defendants did not raise an objection issue until they filed a posttrial—indeed, a post-loss—brief (see Horton v Smith, 51 NY2d 798 [1980]; Miano v Westchester Gulf Serv. Sta., 90 AD2d 477 [1st Dept 1982]). As a result, defendants have waived their objections on this issue.
Defendants further argue that the court’s acceptance of two valuations—the valuation of AIG and the valuation of plaintiffs’ trial expert—prevents reasonable certainty in assessing damages. We reject this argument. First of all, the record provides no basis to support defendants’ claim that TVi was worth absolutely nothing at the time of the dilution.[6] We also *79 note that defendants went to great lengths surreptitiously to acquire assets they now insist are worthless; this conclusion holds true even if one believes, as defendants have insisted on appeal, that all their actions were completely above board.
Even putting aside the fact that defendants’ protestations on appeal make little sense in light of their own actions—none of which defendants seriously dispute—the evidence presented at trial could reasonably have allowed the court to conclude that, given the lengths that defendants traveled to remove TVi from plaintiffs control, funding for the network would have continued. Likewise, Kagalovsky himself has paid many millions of dollars to finance TVi since he acquired it. The trial court also could have concluded, based on a reasonable interpretation of the evidence, that given the value of NMDC’s interest in TVi, NMDC would have continued to provide programming to TVi at reasonable prices and that TVi would have achieved greater distribution of its audience and its market share. Defendants’ expert did not disagree with many of these conclusions, and even agreed with some of them—for example, that a hypothetical network similar to TVi would be able to expand its broadcasting.
Defendants’ remaining arguments on the damages issue, which essentially challenge the court’s credibility assessments, are unavailing (see Matter of Metropolitan Transp. Auth., 86 AD3d at 320).
Defendants next assert that the trial court improperly struck their jury demand in action No. 1. This argument has no merit. Because defendants’ demand for the equitable remedy of rescission in action No. 2 was not “incidental” to that action, and their demand for rescission was not “incidental” to their counterclaims in action No. 1, defendants effectively waived their right to a jury trial by joining those demands with claims for legal relief (see Phoenix Garden Rest. v Chu, 234 AD2d 233, 234 [1st Dept 1996]; O’Rorke v Carpenter, 125 AD2d 223 [1st Dept 1986]). In addition, defendants argued that rescission of the partnership’s license agreements with NMDC was “the core” of their claims in both actions, and defendants all asserted, as part of their action No. 1 counterclaims, that they had “no adequate remedy at law.”
With respect to the tortious interference claim, we find in defendants’ favor. As we have already noted, because Kagalovsky completely dominated and controlled Iota LI] and because he used that domination and control to commit wrongdoing— *80 that is, to dilute the partnership’s ownership of TVi—Iota LP is Kagalovsky’s alter ego (see Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141 [1993]). Thus, defendants are correct in concluding that they cannot be simultaneously alter egos and tortious intervenors (see UBS Sec. LLC v Highland Capital Mgt., L.P., 86 AD3d 469, 476-477 [1st Dept 2011]). Accordingly, we dismiss the claim for tortious interference.
Defendants dispute the trial court’s finding of joint and several liability on the unjust enrichment claim against Kagalovsky. This argument also has merit, and we find in defendants’ favor on this claim. The existence of the license agreements precludes a claim for unjust enrichment against Kagalovsky because the subject matter of the claim is covered by those agreements (see Feigen v Advance Capital Mgt. Corp., 150 AD2d 281, 283 [1st Dept 1989], lv dismissed in part, denied in part 74 NY2d 874 [1989]). Furthermore, Kagalovsky was not a defendant in action No. 2 at trial, as the trial court had already dismissed NMDC’s only claim against him for tortious interference, leaving only the partnership as a defendant in that action (New Media Distribution Co. L.L.C. v Iota Ventures LLP, index No. 650754/2009 [filed on or about Aug. 5, 2011]). The trial court also granted summary judgment dismissing a similar unjust enrichment claim as against Kagalovsky and Iota LP with respect to the partnership agreement (New Media Co. L.L.C. v Kagalovsky, index No. 603742/2009 [filed July 22, 2011]). As there is no other finding of liability against Kagalovsky in action No. 2, we modify the judgment in that action to vacate the award of money damages as against him.
Finally, the trial court flatly rejected defendants’ argument that NMDC agreed to defer payments due under the license agreements upon its finding that the testimony of the only witness with any knowledge of the alleged deferrals was not credible. Defendants offer no reason to disturb that finding, which is entitled to deference (see Matter of Metropolitan Transp. Auth., 86 AD3d at 320).
We have considered defendants’ remaining arguments and find them unavailing.
Accordingly, the judgment of the Supreme Court, New York County (Charles E. Ramos, J), entered September 20, 2012, awarding plaintiff New Media Holding Company, L.L.C. the total sum of $31,732,541.85 as against defendants Konstantin Kagalovsky and Iota LP (action No. 1), should be affirmed, *81 without costs; the judgment, same court and Justice, entered September 20, 2012, awarding plaintiff New Media Distribution Company the total sum of $4,571,059.54 as against defendants Kagalovsky and Iota Ventures LLP (action No. 2), should be modified, on the law, to vacate the award as against Kagalovsky, and otherwise affirmed, without costs; the appeal from the decision, same court and Justice, entered August 16, 2012, should be dismissed, without costs, as taken from a nonappealable paper.
Sweeny, J.P, Saxe, Gische and Clark, JJ., concur.
Judgment, Supreme Court, New York County, entered September 20, 2012 (action No, 1), affirmed, without costs. Judgment, same court and Justice, entered September 20, 2012 (action No. 2), modified, on the law, to vacate the award as against Kagalovsky, and otherwise affirmed, without costs. Appeal from decision, same court and Justice, entered August 16, 2012, dismissed, without costs, as taken from a nonappealable paper.

. Kagalovsky’s initial nominee to the partnership, Petal Capital Holdings, Ltd., was the 50% owner before Iota LR but Kagalovsky later replaced Petal with Iota LP Kagalovsky is the settlor and the beneficiary of the trusts that own Petal.

. At trial, when asked, “[I]n fact, [Gusinski] proposed to buy you out, didn’t he?” Kagalovsky responded, “Probably.” In light of Kagalovsky’s general lack of candor at trial, we interpret this equivocal response to mean that Gusinski did, in fact, offer to buy Kagalovsky’s 50% of the partnership.

. For their part on this appeal, Kagalovsky and Iota LP blandly characterize this method as “recapitalization” that incidentally had the “ultimate effect of diluting the partnership’s ownership of TVi.”

. Nonparty AIG Investments, a private investment firm, owns 13.5% of the remaining interest in NMDC.

. Defendants argue that the trial court improperly considered Delaware law, rather than New York law, in determining this issue. However, there is very little difference between the two states’ laws on the issue; therefore, even assuming for the sake of argument that the trial court committed error, that error would not change our analysis.

. TVi is apparently still broadcasting as of this writing (see TVi, http:// tvi.ua [accessed Mar. 13, 2014]).