■ In the Matter of QUEENS WEST DEVELOPMENT CORPORATION, Respondent. NIXBOT REALTY ASSOCIATES et al., Appellants. [33 NYS3d 274]—

In a condemnation proceeding, the fee claimants appeal from (1) a decision of the Supreme Court, Queens County (Rios, J.), entered December 18, 2013, and (2) an order of the same court (Raffaele, J.), entered April 7, 2014, which, after a nonjury trial and upon the decision, determined that they were entitled to an award in the principal sum of only $18,086,658 as just compensation for the taking of their real property.

Ordered that the appeal from the decision is dismissed, as no appeal lies from a decision (see Schicchi v J.A. Green Constr. Corp., 100 AD2d 509 [1984]); and it is further,

Ordered that the order is affirmed; and it is further,

Ordered that one bill of costs is awarded to the respondent.

In 1973, tennis professional Fred Botur leased a parcel of land on the Queens waterfront in the Hunters Point section of Long Island City (hereinafter the property) and opened a tennis club on the property (see Matter of Queens W. Dev. Corp. [Nixbot Realty Assoc.], 121 AD3d 903, 904 [2014]). Botur and a business partner, Heinz Nixdorf, purchased the property in 1979 and formed Botnix Realty Corporation to hold the real estate (see id.). In 1986, after Nixdorf's death, the corporation was reorganized as Nixbot Realty Associates (hereinafter Nixbot) (see id.).

In the early 1980s, the City of New York (hereinafter the City) began to consider plans for redeveloping the Long Island City waterfront, and, in particular, Hunters Point, moving it away from its historically industrial character and creating, at least along the waterfront, a mixed residential and commercial area with parks and a waterfront esplanade. A variety of studies were performed and a number of plans were proposed. Plans were finalized in the mid 1990s and, on February 25, 2002 (hereinafter the title vesting date), the New York State Urban Development Corporation (hereinafter UDC), doing business as Empire State Development (see McKinney's Uncons Laws of NY § 6255 [8] [Urban Development Corporation Act (UDCA) § 5 (8), as added by L 1968, ch 174, § 1, as amended]), condemned the property for use in the Hunters Point (Queens

West) Waterfront Development Land Use Improvement Project (hereinafter the Queens West project) (*see Matter of Queens W. Dev. Corp. [Nixbot Realty Assoc.]*, 121 AD3d at 904-905). The UDC subsequently transferred its interest in the property to the City. Nixbot and Nixdorf's heirs (Martin Nixdorf, Matthias Nixdorf, Renate Nixdorf, and the estate of Michael Nixdorf) are the fee claimants (hereinafter collectively the claimants) (*see id.*). The claimants filed a notice of claim with the Supreme Court and sought a hearing to determine reasonable compensation for the taking of the property.

On the title vesting date, the Hunters Point section of Queens remained largely industrial and was zoned M3-1, which allowed the heaviest industrial uses. However, at trial, the claimants argued that, had the City not, in effect, restrained development for years by moving so slowly in its plans to redevelop Hunters Point, the area would have changed its character to reflect the increased demand for moderately priced housing in close proximity to midtown Manhattan, and the property's magnificent views and excellent access to transportation. The appraisal submitted by the claimants' expert identified the property's highest and best use as high-rise residential development and valued the property at $85 million. The City contended that, absent the Queens West project, the area would not have been rezoned and high-rise residential development of the property would not have been financially feasible. The City also presented extensive evidence challenging the claimants' assumptions regarding the profitability of high-rise residential development. The City contended that, as of the title vesting date, the property's highest and best use was "big box" retail and valued the property at $13.44 million. The claimants refuted the City's contention that big box retail was the highest and best use and also submitted evidence to show that, even if big box retail were the highest and best use, the City underestimated the value for such use by approximately $5 million.

After a nonjury trial, the Supreme Court found that high-rise residential development was not financially feasible as of the title vesting date and was, therefore, not the property's highest and best use. The court found that the highest and best use was big box retail, as the City advocated, and valued the property on that basis. The court based its award on the appraisal submitted by the City, but adjusted its determination of the property's value in the claimants' favor. The claimants appeal, arguing that the court erred in rejecting their assessment of the highest and best use of the property and, consequently, severely undervalued the property.

The bedrock of eminent domain law is the principle that, when private property is taken for public use, the condemning authority must "compensate the owner so that he may be put in the same relative position, insofar as this is possible, as if the taking had not occurred" (*Matter of County of Orange v Monroe Bakertown Rd. Realty, Inc.*, 130 AD3d 823, 824 [2015] [internal quotation marks omitted]). "The measure of damages must reflect the fair market value of the property in its highest and best use on the date of the taking, regardless of whether the property is being put to such use at the time" (*id.* at 825 [internal quotation marks omitted]). Moreover, "[i]t is necessary to show that there is a reasonable possibility that the property's highest and best asserted use could or would have been made within the reasonably near future, and a use which is no more than a speculative or hypothetical arrangement may not be accepted as the basis for an award" (*Matter of Village of Haverstraw [AAA Electricians, Inc.]*, 114 AD3d 955, 956 [2014] [internal quotation marks omitted]; *see Matter of County of Orange v Monroe Bakertown Rd. Realty, Inc.*, 130 AD3d at 825; *Matter of City of Long Beach v Sun NLF Ltd. Partnership*, 124 AD3d 654, 655 [2015]).

" '[A] condemnee may not receive an enhanced value for its property where the enhancement is due to the property's inclusion within- a redevelopment plan' " (*Matter of Village of Haverstraw [AAA Electricians, Inc.]*, 114 AD3d at 956, quoting *Matter of Queens W. Dev. Corp.*, 289 AD2d 335, 336 [2001]). Thus, for example, property zoned for industrial use " 'should be valued in accordance with the industrial zoning designation which would apply if the redevelopment plan did not exist,' for '[a] condemnee is only entitled to compensation for what it has lost, not for what the condemnor has gained' " (*Village of Haverstraw [AAA Electricians, Inc.]*, 114 AD3d at 956, quoting *Matter of Queens W. Dev. Corp.,* 289 AD2d at 336).

" 'In determining an award to an owner of condemned property, the findings must either be within the range of the expert testimony or be supported by other evidence and adequately explained by the court' " (*Matter of Board of Commr. of Great Neck Park Dist. of Town of N. Hempstead v Kings Point Hgts., LLC*, 74 AD3d 804, 805-806 [2010], quoting *Matter of City of New York [Reiss]*, 55 NY2d 885, 886 [1982]; *see Chester Indus. Park Assoc., L.P. v State of New York*, 103 AD3d 827, 828 [2013]; *New York Cent. Lines, LLC v State of New York*, 101 AD3d 966, 967 [2012]; *Gyrodyne Co. of Am., Inc. v State of New York*, 89 AD3d 988, 989 [2011]; *Matter of Town of E. Hampton [Windmill II Affordable Hous. Project (9 Parcels)]*,

44 AD3d 963, 964 [2007]). The court's assessment of the suitability of proposed comparable sales is a matter resting within its sound discretion (*see Matter of Metropolitan Transp. Auth.*, 86 AD3d 314, 326 [2011]; *Chase Manhattan Bank v State of New York*, 103 AD2d 211, 222 [1984]; *see also Chemical Corp. v Town of E. Hampton*, 298 AD2d 419, 422-423 [2002]).

Although "[i]n condemnation cases, the authority of this Court to review findings of fact after a nonjury trial is as broad as that of the trial court" and it " 'may render the judgment it finds warranted by the facts, taking into account that in a close case the trial court had the advantage of seeing and hearing the witnesses' " (*Matter of Mazur Bros., Inc. v State of New York*, 97 AD3d 826, 828 [2012], quoting *BRK Props., Inc. v Wagner Ziv Plumbing & Heating Corp.*, 89 AD3d 883, 884 [2011]; *see W.T. Grant Co. v Srogi*, 52 NY2d 496, 510 [1981]; *Matter of Marsh*, 106 AD3d 1009, 1011 [2013]), "[w]here the trial court's explanation of its award is supported by the evidence, it is entitled to deference and will not be disturbed on appeal" (*Matter of Board of Commr. of Great Neck Park Dist. of Town of N. Hempstead v Kings Point Hgts., LLC*, 74 AD3d at 806; *see Chemical Corp. v Town of E. Hampton*, 298 AD2d at 423; *627 Smith St. Corp. v Bureau of Waste Disposal of Dept. of Sanitation of City of N.Y.*, 289 AD2d 472, 473-474 [2001]).

Here, the Supreme Court properly determined that the City established that high-rise residential development of the property was not financially feasible on the title vesting date and, therefore, was not the property's highest and best use.

The claimants argue that, had the Queens West project never been conceived, zoning variances would nevertheless have been granted and the Hunters Point area would have been redeveloped for residential and commercial use. Although the claimants contend that, because of the City's alleged sluggish and desultory pursuit of its plan for the redevelopment of Hunters Point and the Queens waterfront, the property, along with the area as a whole, was prevented from reaching its full development potential, they do not point to any affirmative act by the City which depressed the value of the property or impeded its development (*see Matter of Village of Port Chester*, 43 AD3d 943, 945 [2007]). There is no evidence that zoning variances were denied as a matter of course. On the contrary, one nearby property, the East River Tennis Club (hereinafter the ERTC) was, in fact, rezoned for residential use, but, at the time of the trial, had not been developed for that purpose.

The Supreme Court accepted the claimants' argument that

an application for rezoning would have been granted within a relatively short period after completion of the application process, noting that the area was severely underutilized. The record also demonstrated, however, that, as of the title vesting date, the area remained heavily industrial, lacked schools and hospitals, and would have needed major infrastructure improvements, particularly to the sewer and water system and to the roads, before residential development would have been possible.

There is no dispute that the property's size, view, and proximity to public transportation and major thoroughfares made it highly valuable for development. In addition to these assets, the property was large and had good street frontage. However, even granting the claimants' assumption that, had residential development commenced, businesses such as supermarkets would have quickly followed, they have pointed to no evidence demonstrating that, absent the Queens West project, a prospective developer would have been willing to invest in the property despite the lack of basic utilities or, alternatively, would have been willing to invest in improving the infrastructure itself. Likewise, the claimants have pointed to no authority suggesting that the City had a duty to provide the services needed for residential use despite the area's industrial zoning or to take steps to change the area's character.

The Supreme Court concluded that the claimants had not supported their claim that the neighborhood would attract residents at the anticipated rent rates described by the claimants' expert, noting that the ERTC site remained unbuilt as of the date of vesting even though it had been approved for residential development. The court thus rejected the conclusion of the claimants' appraiser, Robert Von Ancken, that notwithstanding the obstacles to development, the property's highest and best use was high-rise residential development.

Based upon a study of properties in the area, Von Ancken conducted a feasibility analysis, and, thereupon, concluded that a developer could expect a profit of approximately $38 million and that a greater profit could be realized by selling units as condominiums rather than using them as rental units. However, the City's appraiser, Jerome Haims, rebutted Von Ancken's appraisal, casting serious doubt on Von Ancken's conclusions.

Haims's calculations demonstrate that, although Von Ancken's figures do produce the sums he claimed, even small changes to Von Ancken's assumptions regarding items such as $1-2 per square foot per year changes to rental rates, modest

increases in construction costs, and changes in capitalization of less than one percent, each transform Von Ancken's projected profit of $38 million to break-even or multi-million dollar loss scenarios and produce even greater losses when combined. In addition, Haims pointed to significant omissions from Von Ancken's cost estimates such as the cost of environmental remediation and his failure to provide any support for the figures he used in his calculations. Haims concluded that high-rise residential development of the property was not financially feasible and opined that the highest and best use of the property on the title vesting date was big box retail. In rebuttal, the claimants proffered no evidence tending to show that cost variation within the range explored by Haims would be unlikely or that a developer would be willing to risk investment despite the fragility of the assumptions underlying the conclusion of profitability.

Based on the evidence in the record demonstrating the unlikelihood of Von Ancken's conclusions as to the financial feasibility of high-rise residential development, the Supreme Court properly concluded that, on the title vesting date, high-rise residential development of the property was not financially feasible and, therefore, was not the property's highest and best use (see Matter of Village of Port Chester, 43 AD3d at 944). The court also properly relied upon the City's appraisal and adequately explained its departures therefrom which were, in any case, in the claimants' favor (see Matter of City of New York [Reiss], 55 NY2d at 886; Matter of Metropolitan Transp. Auth. [Longridge Assoc., L.P.], 122 AD3d 856, 858 [2014]).

The claimants' remaining contentions are without merit. Balkin, J.P., Sgroi, Duffy and Connolly, JJ., concur.