Town of Harrison v Willow Ridge Country Club, Inc. (2026 NY Slip Op 50133(U))

[*1]

Town of Harrison v Willow Ridge Country Club, Inc.

2026 NY Slip Op 50133(U)

Decided on February 6, 2026

Supreme Court, Westchester County

Ondrovic, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 6, 2026
Supreme Court, Westchester County

Town of Harrison, Petitioner,

againstWillow Ridge Country Club, Inc., TD BANK, NATIONAL ASSOCIATION, 
 PEOPLE'S CAPITAL AND LEASING CORP., Respondents.

Index No. 54116/2021

BOND, SCHOENECK & KING, PLLC Attorneys for Petitioner Town of Harrison One Lincoln Center Syracuse, New York 13202-1355 Telephone: (315) 218-8631 
ABRAMS FENSTERMAN, LLP Attorneys for Petitioner Town of Harrison 81 Main Street, Suite 400 White Plains, New York 10601 Telephone: (914) 607-7010GOLDSTEIN, RIKON, RIKON & HOUGHTON, P.C. Attorneys for Respondent, Willow Ridge Country Club, Inc. 381 Park Avenue South, Suite 901 New York, New York 10016HOLLAND SCHRIEVER LLP, Attorneys for Respondent, Willow Ridge Country Club, Inc.

Robert S. Ondrovic, J.

A nonjury trial was held to determine the just compensation to be awarded to the respondent Willow Ridge Country Club, Inc. (hereinafter Willow Ridge), for the taking of the subject property known as Willow Ridge County Club, located at 123 North Street, Harrison, New York (hereinafter the subject property). The condemnor, Town of Harrison (hereinafter the Town), took title on June 23, 2021. The court visited the subject property on July 15, 2024.
It is Willow Ridge's position that the highest and best use of the subject property is as an 86-lot single family residential subdivision. Willow Ridge's appraiser valued the property at [*2]$55,600,000 or $650,000 per lot, rounded.
It is the Town's position that the highest and best use of the subject property is for continued use as a public golf course and outdoor recreational facility, operated commercially for profit. The Town's appraiser valued the property at $13,230,000. The Town asserted, however, that if the highest and best use of the property is as a residential subdivision, the Court should find that only 42 single family residential lots are achievable. The Town's appraiser valued the property as a conventional subdivision at $8,505,000, or $202,500 per lot, rounded.
After considering the sworn testimony of the parties' numerous experts, the credibility of the witnesses, the documents admitted into evidence, including, but not limited to, appraisal reports, rebuttal reports, zoning reports, wetland maps, and subdivision studies, and the parties' closing statements, the Court makes the following findings of fact and conclusions of law:
Factual and Procedural HistoryThe Town acquired title to the subject property from Willow Ridge through condemnation proceedings for use as a public golf course and recreation facility. The property contains substantial improvements including a clubhouse, golf course, swimming pool, tennis courts, and playground. An advance payment in the amount of $13,650,000 was paid to Willow Ridge by the Town pursuant to an order dated June 17, 2021.
Since 1917, the 122-acre property operated as a private, 18-hole golf course and country club. The property is zoned in the R-1 Residential District. Permitted uses include single-family detached dwellings on a minimum lot size of one acre. Special exception uses include private recreation area, nonprofit and nonprofit club, recreation.
A nonjury trial was held on 18 nonconsecutive days between October 2024 and January 2025, at which the following relevant testimony was elicited:
Frank Fish, a principal of Buckhurst, Fish & Jacquemart (hereinafter BFJ Planning) testified that BFJ Planning, together with JMC Planning Engineering Landscape Architecture & Land Surveying PLLC (hereinafter JMC), was retained by Willow Ridge to evaluate the redevelopment potential of the property under the zoning code. BFJ Planning was involved in the preparation of the subdivision study dated January 2022 and the final subdivision plan. Fish described that the property has several manmade water features and wetland areas, and the topography as "slightly rolling" and "variable."[FN1]
He stated that although the property has "very good terrain to build on in terms of the subdivision," there is a "water course" that is flanked on both sides by an existing flood area.[FN2]
Fish testified that the final subdivision plan reflects that 86 residential lots can be developed on the property with two main access points. He confirmed that [*3]several lots are within the 100-year floodplain, but explained that development in a floodplain is not prohibited and it is possible to obtain a building permit from the Town provided that certain requirements are satisfied.
On cross-examination, Fish confirmed that approximately 15% of the property slopes greater than 15% grade. Fish acknowledged that a narrow floodway exists on the property along the Beaver Swamp Brook and that building in the floodway is prohibited due to "a danger from water velocity."[FN3]
Fish acknowledged that the plan contemplates constructing roads in multiple locations in the floodway, but claimed "a road can go over a floodway."[FN4]
He confirmed that in June 2021, he had prepared a concept sketch early in the process that included only 65 lots and none were located within the floodplain. Fish acknowledged that he did not consult with anyone from the Town to determine the likelihood that construction in a floodplain would be approved and that the number of lots would be determined by the Town Planning Board following a review process. He agreed that redevelopment of the property as a residential subdivision could take approximately two years. Fish asserted that most of the lots are not encumbered by steep slopes. 
Diego Villareale, a licensed professional engineer, testified that the nature of his business, JMC, includes site development consulting, landscape architecture, planning, surveying, and traffic engineering. He oversaw the preparation of the engineering requirements and preliminary cost estimate dated January 14, 2022, which concluded that it was feasible to develop 86 lots on the property. Villareale explained that the study considered the need for stormwater management measures, grading of the existing topography, an erosion control plan, and drainage. He noted that no residential structures are proposed to be constructed in the floodway; only roadway crossings. Villareale asserted that it is possible to build in a floodplain provided that the residential structure is at least two feet above the base flood elevation for the property. He estimated that the cost of "infrastructure improvements including the roadway, the drainage system, storm water improvements, utilities" is approximately $11 million.[FN5]
Villareale stated that the estimate does not include the construction costs associated with the individual homes.
On cross examination, Villareale acknowledged that the study "identifies areas that could be utilized for storm water management," but does not indicate "how much storm water storage is anticipated."[FN6]
He acknowledged that the study does not include a "full cut and fill analysis" for site grading or a technical evaluation by a professional engineer, which is required to build [*4]roadway crossings in a floodway.[FN7]
He agreed that in his experience, the Town typically requires additional mitigation with respect to permitting development in a floodplain. Villareale stated that only 16 of the 86 proposed lots are located within the floodplain. He asserted that when evaluating the property to determine the redevelopment potential, he considered what was permitted by the Town code. Villareale asserted that it would be speculative to consider "approvability" because he "can't predict what the planning board would do."[FN8]

Anthony Catalano, a board certified environmental engineer and senior principal of Woodard & Curran, testified that he was retained by the Town to prepare a conventional and cluster subdivision analysis for the property "that is technically feasible and meets the parameters of the local zoning and approvable by the planning board."[FN9]
He stated that after considering the property from a "planimetric standpoint," it was concluded that an 87-lot subdivision was feasible.[FN10]
Catalano testified that the next routine step was to engage with the Town's planning consultant and engineer, and reevaluate the initial layout. He noted that upon reconsideration, it was determined that the lots located in the floodplain and wetland areas should be removed, leaving a 56-lot subdivision. Catalano explained that upon review of additional survey information, which reflected a significantly expanded wetland area, the final conventional and cluster subdivision plans proposed a 42-lot subdivision. He noted that the Town's wetlands scientist concluded that there were 31 acres of wetlands on the property, and not 4 acres as initially believed.
Catalano stated that his analysis of stormwater management included a review of storm frequencies over a 24-year period and identifying specific locations onsite for storm basins. He explained that the floodplain is "important to be able to provide some storage [water] volume" and "if there would be any proposed filling within a floodplain it would take up that storage volume and that would have to be made up somewhere else onsite."[FN11]
Catalano opined that there should be no construction within the floodplain since it would raise the water surface elevation within the floodplain and adversely impact adjacent properties. He contended that it was important, even in the early phase of planning, to consider the grading plan for the entire site. Catalano noted that the estimate for a conventional subdivision was approximately $11.2 million, whereas the estimate for a cluster subdivision was approximately $8.6 million. Catalano opined that Willow Ridge's 86-lot proposed subdivision does not include a grading plan for the entire site and does not consider the existence of bedrock and rock outcroppings. He also stated [*5]that there are "a number of issues related to stormwater management and calculating volumes."[FN12]

On cross examination, Catalano acknowledged that he did not corroborate the opinion of the Town's wetlands scientist that there are 31 acres of wetlands on the property, which is contrary to County GIS information reflecting only 4 acres of wetlands. Catalano agreed that a golf course with fairways and manmade features are currently located in the floodplain and wetlands area. He acknowledged that permits can be issued to allow construction on wetlands. He agreed that the Beaver Swamp Brook traverses approximately 1.9 acres of the property, which is less than 2%. Catalano acknowledged that in his report, he concluded that the existing sewer and water capacity is sufficient to support the subdivision. He explained that the Town's subdivision plans do not include any lots located in the floodplain or wetlands because he was told by the Town's planning consultant and engineer that it was unlikely to be approved. Catalano stated that the proposed lots are reserved to the southern portion of the property due to "the bisecting nature of the floodway, floodplain and wetlands."[FN13]
He acknowledged that his report does not include any feasibility studies regarding development in the floodplain or wetland areas.
Daniel Sciannameo, a commercial real estate appraiser, testified that he prepared an appraisal report on behalf of Willow Ridge for the purpose of estimating the market value of the fee simple interest in the subject property as of the date of condemnation. He stated that the highest and best use of the subject property was as a residential subdivision since it is already zoned for development of single-family homes on a minimum of one-acre lots. Sciannameo testified that in his experience, a golf course would not be "the highest and best use for land that is ripe for residential development."[FN14]
He described the property's potential as "an ultra luxury residential enclave" situated between two existing country clubs.[FN15]
Sciannameo testified that the purchase price of the subject property in a letter of intent dated March 4, 2021, was the greater of $20 million or $400,000 multiplied by the number of approved single-family homes. He stated, based on an assumption that the subject property can be developed into 86 single-family lots, the total purchase price under that calculation would be $34,400,000. According to Sciannameo, the purchase price was significantly discounted because of the eminent domain proceeding.
Sciannameo testified that sales of larger tracts of land included in the sales comparison approach are in inferior locations and require large adjustments based on the home prices and median income levels in those locations. He testified that no property of a similar size in an area comparable to Harrison has sold in recent history. Sciannameo stated that he also performed an additional valuation based on a subdivision development analysis. He testified that the [*6]subdivision development analysis, which considers individual building lot sales, corroborated the adjustments that had to be applied in the sales comparison approach. Sciannameo stated that two scenarios were considered under the subdivision development analysis based on whether an environmental impact statement would be required. He concluded that the market value of the fee simple interest in the subject property as of June 23, 2021, was $55,600,000, based on an 86-lot subdivision with a value of $650,000 per lot, and a deduction of $275,000 for demolition costs.
On cross examination, Sciannameo acknowledged that if the lot count for the proposed subdivision was reduced to 56 or 42, his opinion of the value would change. He stated he did not value the property for use as a for-profit golf club since it is not a permitted use as of right under the zoning code. Sciannameo testified that the four bulk land sales he deemed most relevant were sales 2, 3, 6, and 8, and that the mean value of those four sales is $650,000 [FN16]
Sciannameo acknowledged that the comparable bulk land sales he used to calculate the final mean and median were not properties with the largest acreage. He explained that in this case, location was more relevant than size. Sciannameo acknowledged that the mean adjusted bulk land sale value of the four largest comparable sales was $368,000. He acknowledged that, "on the surface," the larger lots "have a much lower value per lot than the smaller lots," however, in his opinion, "the delta between those averages is because of location and other factors and not totally to size."[FN17]
Sciannameo stated that he applied an 80% location adjustment for sales 1 and 5, a 75% location adjustment for sale 7, and a 65% location adjustment for sale 9. He acknowledged that he applied only a 10% size adjustment for sales 2, 3, 6, and 8, where the properties ranged from approximately 3.5 to 7.7 acres. Sciannameo stated that none of the comparables have a market value of more than $50 million because "nothing is of that size in a place like the subject property."[FN18]

Sciannameo testified that when analyzing recent single-family home sales, he included properties located in Rye because the property "has more commonality with Rye than Ridgeway or Elmwood."[FN19]
He disagreed that he only should have relied on recent home sales located in Harrison. Sciannameo testified that he relied on the costs provided by JMC in determining that the total site improvements cost resulted in an average cost per building lot of $189,779. Sciannameo estimated, based on sale trends in Westchester County in the third quarter of 2021, that five lots would be sold per month and all 86 lots would be sold within approximately 18 months. He stated that "a survey that measures absorption of single-family building lots in [*7]Westchester County or anywhere [does not] exist."[FN20]
Sciannameo opined, based on sales of twelve comparable single-family building lots in Town/Village of Harrison and City of Rye, that the average sales price per building lot for the property as of July 2021 was $1,300,000. He noted that he applied a 10% location adjustment for the comparables located in the Rye School District because "the district is considered superior to Harrison."[FN21]
Sciannameo explained that he took into consideration that single-family building lot sales 4 and 6, which sold for $2,950,000 and $2,875,000, "were substantially superior" to the subject property and made appropriate adjustments.[FN22]
He acknowledged that sales 1 and 7 are located proximate to the subject property and in the Harrison School District, and each lot sold for only $950,000. Sciannameo agreed that the unadjusted median for Harrison is $950,000, the unadjusted mean for Harrison is $1.1million, the unadjusted median for Rye is $1.5 million, and the unadjusted mean for Rye is $2 million.[FN23]
He stated that the adjusted mean for Harrison is $1,161,322 and the adjusted mean for Rye is $1,663,619.
Michael Nowicki, a biologist, was retained by Willow Ridge to prepare a wetland evaluation and impact report regarding redevelopment of the property into an 86-lot residential subdivision. He noted that the wetlands are located on the northern and central parts of the property and mainly man-made ponds. Nowicki explained that Beaver Swamp Brook was "manipulated" and "not a natural watercourse anymore."[FN24]
He stated that a substantial part of the 100-foot wetland buffer area was "previously impacted" because the land was graded and filled for development as a golf course.[FN25]
Nowicki concluded that the proposed subdivision would have minimal direct impact on the wetlands because the "wetlands capacity would remain the same."[FN26]
He concluded that development would have a slight impact on floodflow attenuation since the man-made ponds would retain capacity and erosion controls would minimize any runoff from impervious surfaces. According to Nowicki, the addition of stormwater management would improve the condition of the wetlands. He stated, in his experience, "a wetland permit for crossings to get to buildable land is the most valid reason that the agencies usually adhere to or permit."[FN27]
Nowicki noted that the golf course currently has golf cart paths and, when drafting the subdivision plans, the engineer attempted to take advantage of those existing crossings.
On cross examination, Nowicki acknowledged that he only performed a wetlands evaluation and buffer impact assessment, not a delineation. He also acknowledged that there are additional wetland areas on the property that he did not identify on direct examination. Nowicki testified that nearly all of "Road F" is located within the 100-foot buffer and at least one house. He acknowledged that the existing golf cart paths are only 10 feet wide, whereas the roads would be at least 24 feet wide. Nowicki acknowledged that "if the Town's wetland consultant found additional wetlands, that would control for the planning board process."[FN28]
He stated that aside from the ponds, he identified two wetland areas due to the presence of hydrophytic vegetation. Nowicki also acknowledged that a soil scientist found hydrophytic soil less than 18 inches of the surface in "most locations."[FN29]
He stated, however, that most areas in the Town "were filled at one point before there was a wetland law" and "most areas in the Town would be subject to wetlands."[FN30]
Nowicki stated that "[t]ypically a town or planning board would rather you move buildings out of the buffer [area] and have more infrastructure like a stormwater basin."[FN31]
He confirmed that lots 36, 60, 61, 62, 63, 64, 70, 71, 72, 73, and 86 in Willow Ridge's subdivision study are in the buffer area.
After Willow Ridge rested its case, the Court denied the Town's motion for a directed verdict.
Beth Evans, a certified wetlands scientist, testified that she was retained by the Town to delineate the wetland areas on the property. Evans worked for the Town from 1993 until 2022 as a consultant to the planning board. She explained that an area can be disturbed by human activity and still be considered wetland. Evans noted that County GIS maps are a "good resource" to determine whether wetlands are present on a site but "they don't give all of the information." She testified that hydric soils are characteristic of wetlands and there are two muck areas on the property that she considered hydric soil. Evans stated that she and a soil scientist visited the property on two days to perform the delineation. She noted that she visited the property on another occasion when Nowicki and Fish, among others, were also present. Evans testified that she prepared a sketch map delineating the wetlands on the property. She stated that a portion of the wetlands is located in the floodplain, but there is also a peninsula in the northwest corner, an area of hydric soil that extends easterly into the fairway, a portion of wetland in the southeast corner, and "a drainage way that goes up to the south and east in an area of mineral hydric soils."[FN32]
Evans observed that the floodplain is greater in some areas than the wetlands.
Evans opined that the 86-lot subdivision proposed by Willow Ridge does not preserve, protect, and conserve the wetlands on the property. She testified that "development in a floodplain in an active floodway is not consistent with protecting public health and welfare."[FN33]
Evans stated that the Town's proposal does not include development in areas that she delineated as wetlands. She described Beaver Swamp Brook as a perennial watercourse and that there is a floodway associated with it. Evans testified that based on her findings, the survey reflects that there are 31 acres of wetlands on the property.
On cross examination, Evans acknowledged that building asphalt paths, replacing hydrophytic vegetation with fill, using chemicals, mowers, and aeration machines, and playing golf on the property are not consistent with preserving, protecting, and conserving wetlands. She agreed that before she undertook the delineation, "the amount of acres on the site deemed by the State of New York to be state protected wetlands was zero."[FN34]
Evans also acknowledged that a large portion of the area she identified as wetlands is maintained as a "golf course, fairways, greens, tees, roughs" and do not have wetland vegetation.[FN35]
She testified that many of the features on the property are manmade. When asked whether any authority exists, other than her own delineation, demonstrating that there are more than 4 acres of wetlands on the property, Evans stated that "the NRCS soil map and those hydric soils that were put on the County GIS, there's significantly more than four acres of wetlands."[FN36]
She explained that hydric soil is considered wetland if accompanied by hydrology. Evans confirmed that "because the site contains an active maintained golf course, wetland vegetation was not present in all wetland areas."[FN37]

David Steinmetz, managing partner of Zarin & Steinmetz LLP, testified that he prepared a report on behalf of the Town related to land use and zoning issues that could impact redevelopment of the property. Steinmetz described Willow Ridge's 86-lot subdivision plan as a "wish list concept plan" and opined that it was not realistic "[g]iven the topography on the west side of the property the topography on the north side of the property the central wetland corridor, the Beaver Swamp Brook, the ponds brook crossings."[FN38]
He explained that a development application would receive a positive declaration under SEQRA and undergo an extensive environmental review process.
On cross examination, Steinmetz agreed that the Town's appraiser relied on his opinion [*8]that a for-profit golf course would be allowed under the Town code as a special exception use as "a predicate for a highest and best use analysis."[FN39]
He acknowledged that the restriction related to nonprofit use was in place at the time of vesting, but asserted that the restriction was unenforceable. According to Steinmetz, "an application to rezone or clarify the restriction would be promptly approved to allow for for-profit operation use."[FN40]
He agreed with the statements in the Town's appraisal report that in recent years, nonprofit golf clubs have been purchased by developers for residential use, such as former Elmwood Country Club and former Ridgewood Country Club. Steinmetz acknowledged that the former Elmwood Country Club is being redeveloped into 113 single-family homes; the former Ridgewood Country Club is being redeveloped into 99 single-family homes, and the former Hampshire Country Club is being redeveloped into 105 single-family homes. He testified that maintaining the property as a golf course would not be met with community opposition. Steinmetz acknowledged that his report does not include a citation to any caselaw where a court has struck a restriction against for-profit golf courses where nonprofit golf courses are permitted.
Richard Lobel, a zoning and land use attorney, testified that a for-profit golf club is not a permissible use of the property under the Town code and disagreed with Steinmetz's opinion that the Town would disregard its own zoning code. Lobel testified that the special exception permit under the code only applies to nonprofit recreation clubs and is unambiguous.
Diego Villareale testified that Defendant's Exhibit Z-1 is a map dated November 22, 2022, that was prepared by a soil scientist, Paul Jaehnig, and illustrates the location of hydric soils on the property. He initially testified that JMC relied on the "wetlands delineation" performed by Michael Nowicki, however, later testified that he was aware Nowicki never did a wetlands delineation. Villareale stated that the hydric soil overlay admitted as Defendant's Exhibit AA-1 was not used by JMC in its report. He testified that a proper wetland evaluation and/or delineation typically includes soil testing.
Villareale testified that there were several concept layouts that were provided by BFJ Planning to JMC, including a concept plan that had a 60-lot layout. Villareale agreed that in order to ascertain the number of lots in a cluster subdivision, a conventional plan was necessary. He acknowledged that each lot on the 86-lot conventional subdivision plan "is not necessarily outside of a wetland area" or "outside of a steep slope area" and some of the lots encroach into the floodway and floodplain.[FN41]
Villareale clarified that no structures are located within the floodway - only roadway crossings. He stated that it was his understanding that some of the lots are located in areas that contain hydric soil, but an "area needs to meet the three criteria to be [*9]considered a wetland, not one of the three."[FN42]

Villareale stated that during a preapplication meeting, it is typical for the municipality to provide feedback. He acknowledged that BFJ used the hydric soil overlay marked as Defendant's Exhibit Z-1 for the 86-lot subdivision plan. Villareale agreed that Willow Ridge's proposed subdivision plan would likely require a "full-blown environmental review."[FN43]

Patrick Cleary testified that he is a professional planner who has worked for the Town for more than 30 years. He stated that in order for a structure to be built in a floodplain, it would have to be elevated at least two feet above the base flood elevation or must be "floodproof."[FN44]
He testified, based on his review of Willow Ridge's subdivision plan, that there was no information regarding testing for herbicides, pesticides, and fungicide at the property or the "depth to bedrock."[FN45]
Cleary stated that when the Town receives an application proposing to construct roads or structures in a floodplain, the Town typically requires that those encroachments be removed. He testified that it would be "highly unusual" for the Town to permit construction of a roadway in a floodway.[FN46]

Adam Sterling, a commercial real estate appraiser, testified that he was involved in the preparation of the appraisal report submitted by Sterling Appraisals on behalf of the Town. He testified that the Town's appraisal assumes that the legal restriction related to for-profit golf and recreational use of the property is unenforceable. Sterling explained that the property was valued based on its "residential development potential" using "the subdivision development method" and "on the basis of bulk land sales."[FN47]
He stated that the property was also valued using a direct income capitalization approach assuming it is operated "with a for-profit motive."[FN48]

Sterling testified that opposite the subject property is the Sunny Ridge neighborhood, where 36 dwellings sold at a median price of $1,319,267 on a median lot of .5 acres, and the Sterling Ridge neighborhood, where 49 dwellings sold at a median price of $2,000,000 on a median lot of 1.02 acres. He stated that he did not include building lot sales in the City of Rye because it is a more affluent community than Harrison. Sterling testified that for both the conventional and cluster subdivision plans, he assumed that 42 single family residential building [*10]lots would be achievable. He stated that "the income capitalization approach based on the assumption of for-profit golf and recreation use exceeded the value indications indicated by both the bulk sales method and the subdivision development method based on single-family residential development potential."[FN49]
Based on that finding, Sterling concluded that a for-profit golf and recreation use was the highest and best use of the property.
Sterling concluded, with respect to the subdivision development method, that as of the title vesting date, the value of a finished one-acre lot was $950,000. He noted that four of the six building lot sales used as comparables for the subdivision development method are located within close proximity to the property. He noted that building lot sale 1 is located in Harrison, has a Rye post office address, 3 building lots, each an average size of 1.71 acres, and the sale price per lot was $1,268,667. Building lot sale 2 is also located in Harrison, has a Rye post office address, and sold for $950,000. Building lot sale 3 is a new single-family dwelling under construction on 1.38 acres and sold for $950,000. Building lot sale 4 is located in Harrison, has a Purchase post office address, is 1.77 acres, and sold for $925,000. Building lot sale 5 is located in Harrison, has a West Harrison post office address, is 1.07 acres, and sold for $950,000. Building lot sale 6 is located in Harrison, has a Harrison post office address, 2 building lots, each an average size of 1 acre, and the sale price per lot was $600,000. Sterling testified that a 5% downward location adjustment was warranted for building lot sales 1, 2, 3, and 4, to account for the fact that they had a Rye or Purchase address, and a 5% downward adjustment was appropriate for building lot sales 1 and 4 because of the larger acreage. He also opined that an upward adjustment of 5% was warranted for building lot sales 3 and 5 due to the configuration of the lots and the topography. 
Sterling testified that with respect to the cluster subdivision method, there were a limited number of comparable building lot sales in Harrison under one acre. He opined, based on two sales, that the market value of a finished half-acre lot was $850,000. Sterling estimated, based on a building lot absorption analysis of four comparables, that one single-family residential building lot would sell per three-month period. He estimated that the as-is value of the property for the conventional subdivision was $8,700,000 and the as-is value of the property for the cluster subdivision was $8,500,000.
Sterling testified that he also performed a large bulk residential land sales analysis using five comparables. Bulk land sale 1 is a 107 acre, not-for-profit golf course and country club known as Elmwood Country Club, has a White Plains post office address, and is located in the Town of Greenburgh. That property sold for $13,000,000. Sterling concluded that the price per building lot was $109,244 based on 119 lots, however, if he had used 113 lots, the final adjusted price would have been approximately 5% higher. He opined that the location was inferior to the subject property and that an upward adjustment of 10% was warranted. Bulk land sale 2 is a 95 acre complex located in the Village of Briarcliff Manor and the Ossining School District. That property sold in June 2017 for $12,250,000. Sterling opined that due to significant steep slopes on that property, only 55 lots averaging .92 acre could be built, but the developer was unable to [*11]proceed with that project. Sterling stated that a 20% downward location adjustment was appropriate based on his opinion that Briarcliff Manor is a more affluent community than Harrison. Bulk land sale 3, which was also relied upon in Willow Ridge's appraisal, is a 31.55 acre parcel located in the Village of Rye Brook and zoned in the Blind Brook School District. That property sold for $20,000,000. It was contemplated that 110 single-family homes would be built on that property. Bulk land sale 4, which was also relied upon in Willow Ridge's appraisal, is approximately 25 acres, located in Valhalla, and zoned in the Mt. Pleasant School District. That property sold for $7,350,000, and it was subdivided into 26 single-family building lots averaging .82 acres. Bulk land sale 5 is the former Ridgeway Golf Course located in the City of White Plains and zoned in the White Plains School District. That property sold for $16,500,000. It was contemplated that a 99-lot subdivision would be developed on that property, which was approximately 130 acres. Sterling applied a 5% downward location adjustment because that property was located close to downtown White Plains that has an array of shopping and dining facilities. Sterling also applied adjustments based on the number of lots, encumbrances/easements, and demolition for each of the bulk land sale comparables. He noted that for bulk land sale 5, he applied a 12.5% upward building lot adjustment because that property involved 100 lots as compared to 42 lots for the subject property, and a 10% upward lot size adjustment since each lot was slightly smaller at .7 acres. Based on his analysis, Sterling concluded with respect to the subject property that the adjusted sales price per building lot for the residential subdivision plan was $202,500 and $181,000 for the cluster subdivision plan.
Sterling testified that assuming the Town will legally permit the property to be operated as a for-profit golf and recreational facility, he determined the value using an income capitalization approach. He stated that he "estimate[d] first-year earnings or net operating income for the subject property on a normalized or a stabilized basis and then translate[d] that estimate of net operating income into a value indication using what's known as an overall capitalization rate."[FN50]
Sterling noted that because there are limited public golf courses in Westchester County, he considered golf courses located in Rockland County and Long Island. He opined that Hudson Hills, Patriot Hills, and Harbor Links "provide the best indication of the overall green fee for the subject property" and concluded that the average green fee was approximately $110 per round.[FN51]
Sterling concluded, based on data of the number of rounds, total revenues and total revenues per round for six public daily fee golf courses owned by Westchester County that the property would have generated approximately 27,000 rounds per year as of the valuation date. He testified that the swim and tennis facilities would also generate revenue and estimated, based on six comparables, that an annual swim and tennis membership fee would be $2,300 as of the valuation date and, based on the size of the pool area, would generate around 450 annual family memberships. Sterling also concluded, based on data from five comparables, that the rental value of the first floor of the clubhouse would be $44.50 per square foot and the rental value of the second floor of the clubhouse would be $24.75 per square foot. He further opined that the rental value of the retail golf and tennis shops would be $36 per square foot and [*12]the rental value of storage and garage rentals would be $19 per square foot. Sterling testified that the operating expense estimate for the property was approximately 70% of gross revenues, which is consistent with market norms. Sterling concluded that the estimated annual effective gross income was $4,766,085; estimated annual expenses, which include real estate taxes, operating expenses, and management fees, was $3,919,351; the net operating income was $846,734; and, at an overall capitalization rate of 6.4%, the estimated market value was approximately $13,230,000. He emphasized that the value was significantly higher than the estimates of value using the subdivision method and bulk land sales method.
On cross examination, Sterling acknowledged that he prepared a draft appraisal report dated December 16, 2020, indicating that the highest and best use of the property was redevelopment as a residential subdivision with 72 single-family detached dwellings and a separate senior living facility. He testified that he reached that conclusion without the benefit of Steinmetz's legal guidance and opinions at that time. Sterling also acknowledged that he prepared a draft appraisal report dated January 4, 2021, finding that the highest and best use of the property was redevelopment as a residential subdivision with 78 single-family detached dwellings. He also admitted that in an engagement letter dated March 10, 2022, which was sent to the Town's attorney for purposes of preparing a "trial ready appraisal for this proceeding,"[FN52]
it was indicated that the highest and best use of the property would be as a single-family residential subdivision. Sterling agreed that if Steinmetz's opinion regarding use of the property as a for-profit golf course and recreational facility is not correct, it would affect the conclusions in his appraisal report. He acknowledged that Willow Ridge was struggling financially at the time it was acquired by the Town and, in recent years, golf courses and country clubs in the lower Hudson Valley have been purchased by developers for residential use, such as Elmwood Country Club and Ridgeway Country Club. He also admitted that his opinion regarding the highest and best use would change if the value per lot was determined to be over $316,000, or if more than 42 lots can be developed.
On rebuttal, Sciannameo testified that it "stretches credulity" and is unreasonable to conclude that the highest and best use of the property is "a continuation of a golf course" given that it is located in "one of the most desirable communities in southern Westchester County.[FN53]
Sciannameo testified that Sterling's opinion is based on an extraordinary assumption that the property can operate as a for-profit golf course, which is prohibited under the zoning code. He stated that Sterling's appraisal fails to reflect the costs associated with obtaining a special use exclusion permit from the Town. Sciannameo opined, based on market behavior, that "golf courses usually work on very thin margins and not profitable" and "they typically get sold for residential development."[FN54]
He also opined that Sterling substantially underestimated the value of the property as a residential development. Sciannameo further testified that he disagreed with [*13]Sterling's valuation of the property as a golf course, noting that Sterling did not perform a sales comparison of a golf course being purchased for continued use as a golf course "because there are none."[FN55]
He stated that Sterling did not consider the green fee during off-peak months and the lower membership fees typically offered to senior citizens and juniors.
On cross rebuttal examination, Sciannameo testified that Sterling should have considered that a for-profit golf course would receive no income at all during the period the Town would be seeking a special exception use, which would result in a lower value. He acknowledged that requiring site plan review for a particular use does not preclude a finding that it is the highest and best use. Sciannameo admitted that the per lot value of $400,000 in the letter of intent was lower than the $650,000 per lot value he arrived at, but noted that the letter of intent was issued "in the face of condemnation."[FN56]

On rebuttal, Sterling testified that five of the bulk land sales used by Sciannameo in his appraisal report are substantially smaller than the property and "fail the test of the substitution that underlies the sales comparison approach."[FN57]
He opined that Sciannameo did not apply adequate downward size adjustments to those five smaller bulk sales. Sterling also emphasized that approximately 90% of Willow Ridge's 86-lot conventional subdivision plan would not enjoy any golf course views. Sterling contended that it was not appropriate for Sciannameo to use comparable sales located in the City of Rye or larger downward adjustments for location should have been applied. He further testified that scenario one of Sciannameo's discounted cash flow analysis, which contemplated that the proposed 86-lot subdivision would receive a negative declaration under SEQRA, should be disregarded because redevelopment of the property would necessarily require a more rigorous review. Sterling testified that Willow Ridge's appraisal report improperly concludes that the highest and best use of the property is as a residential subdivision without analyzing the value of the property as a golf course.

Closing Statements
In a closing statement, the Town argued, among other things, that continued use of the property as a golf course is the highest and best use and maximally productive as compared to redevelopment of the property as a single-family residential subdivision. The Town contended that it was improper for Willow Ridge to determine the value of the property as if it had been subdivided at the time of the taking by calculating the total market value of the proposed lots in the hypothetical 86-lot subdivision plan and then deducting the estimated development costs. The Town emphasized that the trial testimony regarding the number of lots that would be approved by the Planning Board following a review process was highly speculative and is not reliable to determine just compensation. The Town asserted that if it is determined that the [*14]highest and best use of the property is as a residential subdivision, the appropriate analysis to determine its fair market value should be based on the bulk land sales analysis. The Town argued that the $650,000 per lot valuation set forth in Willow Ridge's appraisal report is grossly overstated and inflated.
The Town argued that if it is determined that the subdivision development method is appropriate to determine the value of the property, the number of lots should not exceed 42. The Town asserted that Willow Ridge, in determining that 86 lots are feasible, failed to appropriately consider the physical limitations of the property, including the wetlands, steep slopes, floodplains, and regulatory floodway. The Town argued that Sciannameo's reliance on the extraordinary assumption that the property could be developed as an 86-lot residential subdivision was improper and violates the Uniform Standards of Professional Appraisal Practice. The Town asserted that Willow Ridge failed to meet its burden of demonstrating that it is reasonably probable that an 86-lot subdivision on the property is legally permissible and physically possible, and, therefore, that it would be approved.
The Town also contended, based on an analysis of comparable one acre building lot sales, that the value of a finished lot on the subject property is approximately $950,000, as opposed to Sciannameo's conclusion of $1.3 million per lot. The Town argued that Sciannameo skewed the data by including dissimilar properties located in the City of Rye and with larger lot sizes as part of his analysis. The Town further argued that, even accepting Sciannameo's adjustments, the mean and median value of the four comparable bulk land sales used by both appraisers was only $367,387 and $342,408, respectively. The Town asserted that Sciannameo improperly included five smaller bulk land sales in his analysis to determine a final adjusted per lot value of $650,000, which is drastically higher than the mean and median of the four common sales.
Willow Ridge argued, among other things, that it is entitled to just compensation in the amount of $55,600,000. According to Willow Ridge, it demonstrated that an 86-lot residential subdivision is the highest and best use of the subject property and would have been achievable if the Town did not acquire title by eminent domain. Willow Ridge asserted that the value of properties adjacent to, and in the immediate vicinity of the subject property and other golf courses, and within the same Census Tract, is highly material as corroborating evidence of the property's value. Willow Ridge argued that the adjustments made to the comparable sales account for the fact that there are no other highly desirable bulk land sales similar to the subject property.
Willow Ridge claimed that the Town's appraisal improperly relies on properties located miles away, in different Census Tracts, including those with entrances through industrial parks, adjacent to power lines, or in the landing path of an airport. Willow Ridge highlighted that the Town's appraisal report was not done by an independent expert, emphasizing that every single one of the Town's experts had worked for and received remuneration from the Town. Willow Ridge also argued that the Town's wetlands expert created 27 additional acres of wetlands on the property, which were never identified as wetlands until the Town acquired title to the property. Willow Ridge insisted that the 27 acres do not meet the criteria for designation as wetlands. [*15]Willow Ridge asserted that the Town cannot claim that the 27 acres of purported wetlands cannot be developed for purposes of determining just compensation, but then continue to use the same land as part of its golf course operations in a manner that is inconsistent with its own regulations. Willow Ridge argued that its hypothetical subdivision plan provided water mitigation measures and was designed to meet code requirements to address flooding concerns.

Analysis
The Takings Clause of the Fifth Amendment, applicable to the states through the 14th Amendment, provides that private property shall not "be taken for public use, without just compensation" (U.S. Const, 5th Amend). "'When the State takes property by eminent domain, the Constitution requires that it compensate the owner so that he [or she] may be put in the same relative position, insofar as this is possible, as if the taking had not occurred'" (Lebov, LLC v State of New York, 185 AD3d 911, 912 [2d Dept 2020], quoting In re City of New York [Kaiser Woodcraft Corp.], 11 NY3d 353, 359 [2008] [internal quotation marks omitted]).
"'The measure of damages in a condemnation case must reflect the fair market value of the property in its highest and best use on the date of the taking, regardless of whether the property is being put to such use at the time'" (Elpa Bldrs., Inc. v State of New York, 196 AD3d 541, 543 [2d Dept 2021], quoting Matter of 730 Equity Corp. v New York State Urban Dev. Corp., 142 AD3d 1087, 1088 [2d Dept 2016] [internal quotation marks omitted]; see Pacific Carlton Development Corp. v New York State Urban Development Corporation, 206 AD3d 931, 933-34 [2d Dept 2022]). "The determination of highest and best use must be based upon evidence of a use which reasonably could or would be made of the property in the near future" (Matter of 730 Equity Corp. v New York State Urban Dev. Corp., 142 AD3d at 1088; see Matter of City of New York [Broadway Cary Corp.], 34 NY2d 535, 536 [1974]).
In addition, "[a] party asserting a highest and best use different from the existing one must establish that it is reasonably probable that the asserted highest and best use could or would have been made of the subject property in the near future" (Matter of Rochester Urban Renewal Agency v Lee, 83 AD2d 770 [4th Dept 1981]). "Where the parties offer inconsistent highest and best uses and their experts appraise only their own proposed uses, the award must be based upon the evidence offered by the party prevailing on the use question 'with such adjustments as the evidence will support'" (Matter of 730 Equity Corp. v New York State Urban Dev. Corp., 142 AD3d at 1089, quoting Crosby v State of New York, 54 AD2d 1064, 1065 [4th Dept 1976]; see Matter of City of Long Beach v Sun NLF Ltd. Partnership, 124 AD3d 654, 655—656 [2d Dept 2015]).
"'The potential uses the court may consider in determining value are ordinarily limited to those uses permitted by the zoning regulations at the time of taking'" (Matter of 730 Equity Corp. v. New York State Urban Dev. Corp., 142 AD3d 1087, 1088—1089 [2d Dept 2016], quoting Matter of Town of Islip [Mascioli], 49 NY2d 354, 360 [1980]). "However, when there is a reasonable probability of rezoning, some adjustment must be made to the value of the property to reflect that fact" (Matter of 730 Equity Corp. v. New York State Urban Dev. Corp., 142 AD3d at 1089). Where the most advantageous use of the property is as a potential residential subdivision, the correct rule to apply is "to treat the premises not as raw acreage nor as part of a [*16]completed development but as a potential subdivision site giving the acreage an increment in value because of that potential use" (Hewitt v State of New York, 18 AD2d 1128 [2d Dept 1963]; see Matter of County of Suffolk, 37 NY2d 649 [1975]).
In this matter that is rife with complex issues, the parties strenuously disagree about nearly every issue involved including, but certainly not limited to, highest and best use; the proper valuation method; comparable sales; sale price adjustments; environmental impacts; wetland areas; and the number of potential buildable lots.
Contrary to the Town's contention, the Court concludes, as set forth more fully below, that Willow Ridge met its burden of establishing that the highest and best use of the subject property is as a single-family residential subdivision. It is undisputed that the subject property is zoned in an R-1 Residential District and that the highest and best use advanced by Willow Ridge to redevelop the property as a single-family residential subdivision is a principal permitted use. It is also undisputed that the highest and best use advanced by the Town for continued operation as a for-profit golf course and outdoor recreational facility is not a permitted use as-of-right under the zoning regulations at the time of the taking. Rather, a private, nonprofit club or recreation may be permitted as a special exception use. Steinmetz, the Town's expert, opined that an application to clarify or amend the zoning law so as to permit the property to operate a for-profit golf course would be promptly approved. Although the Court does not necessarily find that Steinmetz's opinion is incredible, the cases cited by him in support of his opinion are distinguishable and do not sufficiently establish that it is reasonably probable that the legal restriction on for-profit golf and recreational use of the subject property is unenforceable.
Willow Ridge also established that use of the property as a residential subdivision is economically, legally, and physically feasible as well as maximally profitable, albeit not as an 86-lot development. [FN58]
As acknowledged in the Town's appraisal, "[n]ot-for-profit golf courses and country clubs in the Lower Hudson Valley Region of New York in recent years have typically been purchased by developers for future residential use, e.g., former Elmwood Country Club and former Ridgeway Country Club" and "Willow Ridge had also reportedly been struggling financially for years."[FN59]
Conversely, no marketplace evidence was presented at trial of a non-profit golf course being purchased by a private entity for use as a for-profit golf course.
The Court finds that development of the subject property as a potential 56-lot residential subdivision is supported by the credible evidence and testimony adduced at trial. For the reasons set forth below, the Court finds that Willow Ridge failed to demonstrate that it was reasonably probable that it would obtain all of the necessary approvals and permits in order to develop an 86-lot residential subdivision on the subject property. The Court also rejects the Town's contention that a residential subdivision that exceeds 42 lots is not economically, legally, and [*17]physically feasible.[FN60]

Fish, who was involved in the preparation of Willow Ridge's final subdivision plan, acknowledged that in June 2021, he had prepared an early concept sketch that included 60 lots, none of which were in the floodplain. Willow Ridge's final subdivision plan reflects that 86 lots can be developed on the property with two roads, as well as culverts, in the floodway. Fish acknowledged that several of the lots are within the floodplain and certain requirements would have to be satisfied in order to obtain the necessary permits from the Town. Villareale also acknowledged that single-family homes on 16 lots were proposed to be built within the floodplain and some of the lots encroach into the floodway. Catalano, who was retained by the Town to prepare a conventional and cluster subdivision analysis for the property, initially concluded that an 87-lot subdivision was feasible. However, after engaging with the Town's consultant and engineer "related to what the Town felt would be or could be approvable on this site,"[FN61]
Catalano determined that the lots located in the floodplain and wetland areas should be removed, leaving a 56-lot subdivision. However, upon review of additional survey information provided by Evans, the Town's wetlands expert, indicating that there are 31 acres of wetlands on the property, the final conventional and cluster subdivision plans proposed a 42-lot subdivision.
The Court finds that the credible evidence in the record demonstrates that a reduction in the number of lots proposed in Willow Ridge's final subdivision plan would be necessary due to the various issues related to development in a floodplain. Catalano explained that the floodplain is "important to be able to provide some storage [water] volume" and "if there would be any proposed filling within a floodplain it would take up that storage volume and that would have to be made up somewhere else onsite." Although Villareale testified that he considered what was permitted by the Town code when evaluating the property to determine the redevelopment potential, he acknowledged that in his experience, the Town typically requires additional mitigation with respect to permitting development in a floodplain. Catalano opined that there should be no construction within the floodplain since it would raise the water surface elevation within the floodplain and adversely impact adjacent properties. Nowicki, Willow Ridge's expert, agreed that the final subdivision plan is a "concept plan" and "this is not what would be approved by a planning board."[FN62]

In addition, although Evans performed a wetlands delineation, whereas Nowicki did not, the Court finds, based on the testimony of the parties' respective experts and the credible evidence in the record, that the Town failed to demonstrate that a wetland permit for any development of a residential subdivision within the 27 additional acres of wetlands identified by [*18]Evans on the subject property would not be approved. The evidence calls into question whether the 27 acres strictly meet the criteria for designation as wetlands. It is undisputed that the County GIS map indicates that there are only 4 acres of wetlands on the subject property. Evans confirmed that "because the site contains an active maintained golf course, wetland vegetation was not present in all wetland areas." [FN63]
Although Evans opined that an 86-lot residential subdivision does not preserve, protect, and conserve the wetlands on the property, she acknowledged that building asphalt paths, replacing hydrophytic vegetation with fill, using chemicals, mowers, and aeration machines, and playing golf on the property are also not consistent with preserving, protecting, and conserving wetlands. Evans also acknowledged that a large portion of the area she identified as wetlands is maintained as a "golf course, fairways, greens, tees, roughs."[FN64]

"'In determining an award to an owner of condemned property, the findings must either be within the range of expert testimony or be supported by other evidence and adequately explained by the court'" (Matter of 730 Equity Corp. v New York State Urban Dev. Corp., 142 AD3d at 1089, quoting Matter of City of New York [Reiss], 55 NY2d 885, 886 [1982]; see Matter of Village of Haverstraw [Ray Riv. Co., Inc.], 191 AD3d 994, 995—999 [2d Dept 2021]). Furthermore, "[t]he court's assessment of the suitability of proposed comparable sales is a matter resting within its sound discretion" (Matter of Queens W. Dev. Corp. [Nixbot Realty Assoc.], 139 AD3d 863 [2d Dept 2016]; see Matter of Metropolitan Transp. Auth., 86 AD3d 314 [1st Dept. 2011]).
The Court agrees with the Town that the appropriate method to determine the fair market value of the property as a residential subdivision is based on the bulk land sales comparison approach, and not the subdivision development analysis (see Pritchard v Ontario County Indus. Development Agency, 248 AD2d 974 [4th Dept 1998] [appraisal incorrectly valued parcel as subdivided lots minus cost of development]). Although Willow Ridge asserts that there are no true comparables to the subject property in terms of location and size and, as a result, included the subdivision development analysis to "support and buttress [the] conclusions reached via the Sales Comparison Approach," Sciannameo, Willow Ridge's appraiser, applied adjustments to the sale prices of the larger tracts of land used as comparables to account for the "substantially inferior locations."[FN65]

The Town identified five comparable bulk land sales which, after certain adjustments, resulted in a per lot adjusted value of $202,500. When multiplied by 42 potential lots, Sterling concluded that the value of the subject property as a residential subdivision is $8,505,000. Willow Ridge identified nine comparable bulk land sales which, after certain adjustments, [*19]resulted in a mean per lot value of $519,479 and a median per lot value of $545,831.[FN66]
Sciannameo then "reconcile[d]" the per lot value at $650,000, principally by relying upon the mean and median per lot adjusted values of the bulk land sales he deemed "most comparable" (sales 2, 3, 6, and 8 in Willow Ridge's appraisal).[FN67]
When multiplied by 86 potential lots, Sciannameo concluded that the value of the subject property as a residential subdivision is $55,600,000.
The four common bulk land sales used by both appraisers are sales 1, 5, 7, and 9 (31.55 acres).[FN68]
Sale 1 is 130.37 acres and is located in White Plains School District. The purchase price of sale 1 was $16,500,000. Both Sterling and Sciannameo arrived at a per lot adjusted value based on 100 potential single-family lots, however Sterling found an adjusted value of $205,756, whereas Sciannameo found an adjusted value of $307,134. Sale 5 is 106.8 acres and is located in Greenburgh and Elmsford School Districts. The purchase price of sale 5 was $13,000,000. Sciannameo utilized 113 single-family lots to arrive at a per lot adjusted value of $272,070. Sterling agreed that he should have used the same number of lots, which would have increased his per lot adjusted value of $179,646 by approximately 5 percent. Sale 7 is 25.13 acres and is located in the Mt. Pleasant School District. The purchase price of sale 7 was $7,350,000. Both Sterling and Sciannameo arrived at a per lot adjusted value based on 26 single-family lots, however Sterling found an adjusted value of $209,008, whereas Sciannameo found an adjusted value of $512,663. Sale 9 is 31.55 acres and is located in Blind Brook School District. The purchase price of sale 9 was $20,000,000. Both Sterling and Sciannameo arrived at a per lot adjusted value based on 110 single-family lots, however Sterling found an adjusted value of $194,994, whereas Sciannameo found an adjusted value of $377,682. Although the location adjustments made by Sciannameo were considerable, the Court finds that Sciannameo sufficiently and credibly explained the basis for those adjustments, which were based in large part on U.S. Census Tract data. In contrast, the Court finds that Sterling's appraisal did not adequately account for the differences between the location of the subject property and the locations of the four common bulk land sales by applying an adjustment ranging between only 0% and 10%. 
In addition to the four common bulk land sales, Sterling used one additional bulk land sale (sale 2 in the Town's appraisal), that Willow Ridge did not use. Sale 2 is somewhat similar in size to the subject property insofar as it is 94.82 acres. The purchase price of sale 2 was $12,250,000. Sale 2 is located in the Village of Briarcliff Manor, which Sterling testified is a more affluent community, and Ossining School District, which Sciannameo opined is less desirable than Harrison School District. Sterling arrived at a per lot adjusted value of $206,492 [*20]based on a formula resulting in 55 potential single-family lots. Despite that a zoning change was required for residential development, the enactment of a one-year moratorium on development, and, ultimately, a zoning change permitting only commercial use on the site, Sterling applied only a 5% adjustment for sale conditions and approvals. The Court agrees with Sciannameo that a 20% adjustment is more appropriate. In addition, Sterling applied a location/school district adjustment of -20%, which reflects an offset of a 20% school district adjustment against a -40% location adjustment. The Court agrees with Sciannameo that a more appropriate offset would result in a 25% location/school district adjustment, which, together with a 20% sale conditions and approvals adjustment, results in a per lot adjusted value of $368,835.
Willow Ridge used five additional comparable bulk land sales, sales 2, 3, 4, 6, and 8, which the Town did not use. Two of those properties are located in the same municipality and school district as the subject property (sales 2 and 6). Two of the properties are located in the Harrison School District but different municipalities (sales 2 and 3). One of the properties is located in Greenburgh municipality and school district (sale 4), and the remaining property is located in North Castle and Byram Hills School District (sale 8). Sale 6 is 3.56 acres with 3 building lots; sale 2 is 5.11 acres with 3 building lots; sale 3 is 7.77 acres with 7 building lots; sale 4 is 14.70 acres with 15 building lots, and sale 8 is 6.08 acres with 5 building lots; yet Sciannameo only applied a -10% adjustment for size/marketability. The Court agrees with the Town that these properties should not have been selected as comparables due to the extraordinary difference in acreage and number of building lots, and, thus, were excluded. 
Based on the foregoing, the Court concludes that the final adjusted per lot value is $368,000, based on a mean of $367,677 and a median of $368,835. Therefore, when multiplied by 56 potential lots, the value of the subject property is $20,608,000. Since an advance payment in the amount of $13,650,000 was paid to Willow Ridge by the Town pursuant to an order dated June 17, 2021, the amount of additional just compensation awarded to Willow Ridge is $6,958,000, with interest thereon from the date of the taking, June 23, 2021, together with costs and allowances as provided by law.
Accordingly, it is hereby
ORDERED that the petitioner the Town of Harrison shall pay as compensation to the claimant Willow Ridge Country Club, Inc. additional just compensation in the amount of $6,958,000, with interest thereon from the date of the taking, June 23, 2021, together with costs and allowances as provided by law. 
Dated: February 6, 2026White Plains, NYHON. ROBERT S. ONDROVIC, J.S.C.

Footnotes

Footnote 1:Transcript 10/22/2024 at 16-17

Footnote 2:id. at 17-18

Footnote 3:id. at 66

Footnote 4:id.

Footnote 5:id. at 109

Footnote 6:id. at 118

Footnote 7:id. at 120

Footnote 8:id.

Footnote 9:Transcript 10/23/2024 at 209

Footnote 10:id. at 211

Footnote 11:id. at 220

Footnote 12:id. at 233

Footnote 13:Transcript 10/24/2024 at 290

Footnote 14:id. at 403 

Footnote 15:id. at 405

Footnote 16:Transcript 10/28/2024 at 625

Footnote 17:id. at 630

Footnote 18:id at 672

Footnote 19:id. at 648

Footnote 20:Transcript 10/29/2024 at 727

Footnote 21:id. at 741

Footnote 22:id. at 744

Footnote 23:id. at 767

Footnote 24:Transcript 10/30/2024 at 792

Footnote 25:id. at 793

Footnote 26:id. at 794

Footnote 27:id. at 805

Footnote 28:id. at 829

Footnote 29:id. at 853

Footnote 30:id. at 863

Footnote 31:id. at 883

Footnote 32:Transcript 10/31/2024 at 936

Footnote 33:id. at 948

Footnote 34:id. at 979

Footnote 35:id. at 985

Footnote 36:id. at 991

Footnote 37:id. at 996

Footnote 38:Transcript 11/1/2024 at 1044, 1053

Footnote 39:id. at 1085

Footnote 40:id. at 1113

Footnote 41:Transcript 12/3/2024 at 1290

Footnote 42:id. at 1312

Footnote 43:id. at 1332

Footnote 44:id. at 1394

Footnote 45:id. at 1406

Footnote 46:id. at 1412

Footnote 47:Transcript 12/5/2024 at 1448

Footnote 48:id. at 1148-1449

Footnote 49:id. at 1468-1469

Footnote 50:id. at 1546

Footnote 51:id. at 1551-1552

Footnote 52:Transcript 1/14/2025 at 1630

Footnote 53:Transcript 1/15/2025 at 1722-1724

Footnote 54:id. at 1730

Footnote 55:id. at 1788

Footnote 56:id. at 1809 

Footnote 57:id. at 1915

Footnote 58:Willow Ridge correctly notes that the Town's appraisal does not include an analysis of the time and cost to obtain approval for a for-profit golf course.

Footnote 59:VEC Doc No 1-9

Footnote 60:It bears noting that in a letter of intent dated March 4, 2021, the purchase price for the subject property was the greater of $20 million or $400,000, multiplied by the number of approved single-family homes, which assumes that a minimum 50-lot subdivision is feasible.

Footnote 61:Transcript 10/23/2024 at 212

Footnote 62:Transcript 10/30/24 at 893

Footnote 63:id. at 996

Footnote 64:id. at 985

Footnote 65:VEC Doc No 1-7

Footnote 66:Willow Ridge's appraisal included a mean and median adjusted acreage value of $552,641 and $511,831, respectively.

Footnote 67:id.

Footnote 68:For ease of reference, the Court utilized the numbering set forth by Sciannameo in Willow Ridge's appraisal on pages 94-95.